## McDANIEL *v.* PATY ET AL.

No. 76–1427.  Argued December 5, 1977—Decided April 19, 1978

619

BURGER, C. J., announced the Court's judgment, and delivered an opinion, in which POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 629. STEWART, J., *post*, p. 642, and WHITE, J., *post*, p. 643, filed opinions concurring in the judgment. BLACKMUN, J., took no part in the consideration or decision of the case.

*Frederic S. Le Clercq* argued the cause and filed a brief for appellant.

*Kenneth R. Herrell,* Assistant Attorney General of Tennessee, argued the cause for appellees. With him on the brief for appellees Hassler et al. were *Brooks McLemore,* Attorney General, and *C. Hayes Cooney,* Chief Deputy Attorney General. *Phillip C. Lawrence* filed a brief for appellee Paty.*

MR. CHIEF JUSTICE BURGER announced the judgment of the Court and delivered an opinion in which MR. JUSTICE POWELL, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS joined.

The question presented by this appeal is whether a Tennessee statute barring "Minister[s] of the Gospel, or priest[s] of any denomination whatever" from serving as delegates to the State's limited constitutional convention deprived appellant McDaniel, an ordained minister, of the right to the free exercise of religion guaranteed by the First Amendment and made applicable to the States by the Fourteenth Amendment. The First Amendment forbids all laws "prohibiting the free exercise" of religion.

---

*Leo Pfeffer, Abraham S. Goldstein, Joel Gora, George W. McKeag, John T. Redmond, James W. Respess,* and *Thomas A. Shaw* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

## I

In its first Constitution, in 1796, Tennessee disqualified ministers from serving as legislators.[1] That disqualifying provision has continued unchanged since its adoption; it is now Art. 9, § 1, of the State Constitution. The state legislature applied this provision to candidates for delegate to the State's 1977 limited constitutional convention when it enacted ch. 848, § 4, of 1976 Tenn. Pub. Acts: "Any citizen of the state who can qualify for membership in the House of Representatives of the General Assembly may become a candidate for delegate to the convention . . . ."

McDaniel, an ordained minister of a Baptist Church in Chattanooga, Tenn., filed as a candidate for delegate to the constitutional convention. An opposing candidate, appellee Selma Cash Paty, sued in the Chancery Court for a declaratory judgment that McDaniel was disqualified from serving as a delegate and for a judgment striking his name from the ballot. Chancellor Franks of the Chancery Court held that § 4 of ch. 848 violated the First and Fourteenth Amendments to the Federal Constitution and declared McDaniel eligible for the office of delegate. Accordingly, McDaniel's name remained on the ballot and in the ensuing election he was elected by a vote almost equal to that of three opposing candidates.

After the election, the Tennessee Supreme Court reversed the Chancery Court, holding that the disqualification of clergy imposed no burden upon "religious belief" and restricted "religious action . . . [only] in the lawmaking process of government—where religious action is absolutely prohibited by the establishment clause . . . ." 547 S. W. 2d 897, 903 (1977).

---

[1] "Whereas Ministers of the Gospel are by their profession, dedicated to God and the care of Souls, and ought not to be diverted from the great duties of their functions; therefore, no Minister of the Gospel, or priest of any denomination whatever, shall be eligible to a seat in either House of the Legislature." Tenn. Const., Art. VIII, § 1 (1796).

The state interests in preventing the establishment of religion and in avoiding the divisiveness and tendency to channel political activity along religious lines, resulting from clergy participation in political affairs, were deemed by that court sufficiently weighty to justify the disqualification, notwithstanding the guarantee of the Free Exercise Clause.

We noted probable jurisdiction.[2]  432 U. S. 905 (1977).

## II

### A

The disqualification of ministers from legislative office was a practice carried from England by seven of the original States;[3] later six new States similarly excluded clergymen from some political offices.  1 A. Stokes, Church and State in the United States 622 (1950) (hereafter Stokes).  In England the practice of excluding clergy from the House of Commons was justified on a variety of grounds: to prevent dual officeholding, that is, membership by a minister in both Parliament and Convocation; to insure that the priest or deacon devoted himself to his "sacred calling" rather than to "such mundane activities as were appropriate to a member of the House of Commons"; and to prevent ministers, who after 1533 were subject to the Crown's powers over the benefices of the clergy, from using membership in Commons to diminish its independence by increasing the influence of the King and the nobility.  *In re MacManaway*, [1951] A. C. 161, 164, 170–171.

The purpose of the several States in providing for disqualification was primarily to assure the success of a new political experiment, the separation of church and state.  Stokes 622.

---

[2] The judgment of the Tennessee Supreme Court was stayed until final disposition of this appeal.  McDaniel is currently serving as a delegate.

[3] Maryland, Virginia, North Carolina, South Carolina, Georgia, New York, and Delaware.  L. Pfeffer, Church, State, and Freedom 118 (Rev. ed. 1967).  Three of these—New York, Delaware, and South Carolina—barred clergymen from holding any political office.  *Ibid.*

Prior to 1776, most of the 13 Colonies had some form of an established, or government-sponsored, church. *Id.*, at 364–446. Even after ratification of the First Amendment, which prohibited the Federal Government from following such a course, some States continued pro-establishment provisions. See *id.*, at 408, 418–427, 444. Massachusetts, the last State to accept disestablishment, did so in 1833. *Id.*, at 426–427.

In light of this history and a widespread awareness during that period of undue and often dominant clerical influence in public and political affairs here, in England, and on the Continent, it is not surprising that strong views were held by some that one way to assure disestablishment was to keep clergymen out of public office. Indeed, some of the foremost political philosophers and statesmen of that period held such views regarding the clergy. Earlier, John Locke argued for confining the authority of the English clergy "within the bounds of the church, nor can it in any manner be extended to civil affairs; because the church itself is a thing absolutely separate and distinct from the commonwealth." 5 Works of John Locke 21 (C. Baldwin ed. 1824). Thomas Jefferson initially advocated such a position in his 1783 draft of a constitution for Virginia.[4] James Madison, however, disagreed and vigorously

---

[4] 6 Papers of Thomas Jefferson 297 (J. Boyd ed. 1952). Jefferson later concluded that experience demonstrated there was no need to exclude clergy from elected office. In a letter to Jeremiah Moor in 1800, he stated: "[I]n the same scheme of a constitution [for Virginia which I prepared in 1783, I observe] an abridgment of the right of being elected, which after 17 years more of experience & reflection, I do not approve. It is the incapacitation of a clergyman from being elected. The clergy, by getting themselves established by law, & ingrafted into the machine of government, have been a very formidable engine against the civil and religious rights of man. They are still so in many countries & even in some of these United States. Even in 1783 we doubted the stability of our recent measures for reducing them to the footing of other useful callings. It now appears that our means were effectual. The clergy here seem to have relinquished all pretensions to privilege, and to stand on a footing with

urged the position which in our view accurately reflects the spirit and purpose of the Religion Clauses of the First Amendment. Madison's response to Jefferson's position was:

"Does not The exclusion of Ministers of the Gospel as such violate a fundamental principle of liberty by punishing a religious profession with the privation of a civil right? does it [not] violate another article of the plan itself which exempts religion from the cognizance of Civil power? does it not violate justice by at once taking away a right and prohibiting a compensation for it? does it not in fine violate impartiality by shutting the door [against] the Ministers of one Religion and leaving it open for those of every other." 5 Writings of James Madison 288 (G. Hunt ed. 1904).

Madison was not the only articulate opponent of clergy disqualification. When proposals were made earlier to prevent clergymen from holding public office, John Witherspoon, a Presbyterian minister, president of Princeton University, and the only clergyman to sign the Declaration of Independence, made a cogent protest and, with tongue in cheek, offered an amendment to a provision much like that challenged here:

" 'No clergyman, of any denomination, shall be capable of being elected a member of the Senate or House of Representatives, because (here insert the grounds of offensive disqualification, which I have not been able to discover) Provided always, and it is the true intent and meaning of this part of the constitution, that if at any time he shall be completely deprived of the clerical character by those by whom he was invested with it, as by deposition for cursing and swearing, drunkenness or uncleanness, he shall then be fully restored to all the privileges of a free

lawyers, physicians, &c. They ought therefore to possess the same rights." 9 Works of Jefferson 143 (P. Ford ed. 1905).

citizen; his offense [of being a clergyman] shall no more be remembered against him; but he may be chosen either to the Senate or House of Representatives, and shall be treated with all the respect due to his *brethren,* the other members of Assembly.' " Stokes 624–625.

As the value of the disestablishment experiment was perceived, 11 of the 13 States disqualifying the clergy from some types of public office gradually abandoned that limitation. New York, for example, took that step in 1846 after delegates to the State's constitutional convention argued that the exclusion of clergymen from the legislature was an "odious distinction." 2 C. Lincoln, The Constitutional History of New York 111–112 (1906). Only Maryland and Tennessee continued their clergy-disqualification provisions into this century and, in 1974, a District Court held Maryland's provision violative of the First and Fourteenth Amendments' guarantees of the free exercise of religion. *Kirkley* v. *Maryland,* 381 F. Supp. 327. Today Tennessee remains the only State excluding ministers from certain public offices.

The essence of this aspect of our national history is that in all but a few States the selection or rejection of clergymen for public office soon came to be viewed as something safely left to the good sense and desires of the people.

## B

This brief review of the history of clergy-disqualification provisions also amply demonstrates, however, that, at least during the early segment of our national life, those provisions enjoyed the support of responsible American statesmen and were accepted as having a rational basis. Against this background we do not lightly invalidate a statute enacted pursuant to a provision of a state constitution which has been sustained by its highest court. The challenged provision came to the Tennessee Supreme Court clothed with the presumption of validity to which that court was bound to give deference.

However, the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions, or, in other words, to be a minister of the type McDaniel was found to be. *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940). Tennessee also acknowledges the right of its adult citizens generally to seek and hold office as legislators or delegates to the state constitutional convention. Tenn. Const., Art. 2, §§ 9, 25, 26; Tenn. Code Ann. §§ 8–1801, 8–1803 (Supp. 1977). Yet under the clergy-disqualification provision, McDaniel cannot exercise both rights simultaneously because the State has conditioned the exercise of one on the surrender of the other. Or, in James Madison's words, the State is "punishing a religious profession with the privation of a civil right." 5 Writings of James Madison, *supra,* at 288. In so doing, Tennessee has encroached upon McDaniel's right to the free exercise of religion. "[T]o condition the availability of benefits [including access to the ballot] upon this appellant's willingness to violate a cardinal principle of [his] religious faith [by surrendering his religiously impelled ministry] effectively penalizes the free exercise of [his] constitutional liberties." *Sherbert* v. *Verner,* 374 U. S. 398, 406 (1963).

If the Tennessee disqualification provision were viewed as depriving the clergy of a civil right solely because of their religious beliefs, our inquiry would be at an end. The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such. *Id.,* at 402; *Cantwell* v. *Connecticut, supra,* at 304. In *Torcaso* v. *Watkins,* 367 U. S. 488 (1961), the Court reviewed the Maryland constitutional requirement that all holders of "any office of profit or trust in this State" declare their belief in the existence of God. In striking down the Maryland requirement, the Court did not evaluate the interests assertedly justifying it but rather held that it violated freedom of religious belief.

In our view, however, *Torcaso* does not govern. By its

terms, the Tennessee disqualification operates against Mc-
Daniel because of his *status* as a "minister" or "priest." The
meaning of those words is, of course, a question of state law.[5]
And although the question has not been examined extensively
in state-law sources, such authority as is available indicates
that ministerial status is defined in terms of conduct and
activity rather than in terms of belief.[6] Because the Tennes-
see disqualification is directed primarily at status, acts, and
conduct it is unlike the requirement in *Torcaso,* which focused
on *belief.* Hence, the Free Exercise Clause's absolute prohi-
bition of infringements on the "freedom to believe" is inap-
posite here.[7]

This does not mean, of course, that the disqualification
escapes judicial scrutiny or that McDaniel's activity does not
enjoy significant First Amendment protection. The Court

---

[5] In this case, the Tennessee Supreme Court concluded that the disquali-
fication of McDaniel did not interfere with his religious *belief.* 547 S. W.
2d 897, 903, 904, 907 (1977). But whether the ministerial status, as de-
fined by state law, implicates the "freedom to act" or the absolute "free-
dom to believe," *Cantwell* v. *Connecticut,* 310 U. S. 296, 304 (1940), must
be resolved under the Free Exercise Clause. Thus, although we consider
the Tennessee court's resolution of that issue, we are not bound by it.

[6] The Tennessee constitutional provision embodying the disqualification
inferentially defines the ministerial profession in terms of its "duties,"
which include the "care of souls." Tenn. Const., Art. 9, § 1. In this case,
the Tennessee Supreme Court stated that the disqualification reaches those
filling a "leadership role in religion," and those "dedicated to the full time
*promotion* of the religious objectives of a particular religious sect." 547
S. W. 2d, at 903 (emphasis added). The Tennessee court, in defining
"priest," also referred to the dictionary definition as "one who *performs*
sacrificial, ritualistic, mediatorial, interpretative, or ministerial func-
tions . . . ." *Id.,* at 908 (quoting Webster's Third New International Dic-
tionary 1799–1800 (1971)) (emphasis added).

[7] The absolute protection afforded belief by the First Amendment suggests
that a court should be cautious in expanding the *scope* of that protection
since to do so might leave government powerless to vindicate compelling
state interests.

recently declared in *Wisconsin* v. *Yoder,* 406 U. S. 205, 215 (1972):

> "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." [8]

Tennessee asserts that its interest in preventing the establishment of a state religion is consistent with the Establishment Clause and thus of the highest order. The constitutional history of the several States reveals that generally the interest in preventing establishment prompted the adoption of clergy disqualification provisions, see Stokes 622; Tennessee does not appear to be an exception to this pattern. Cf. *post,* at 636 n. 9 (BRENNAN, J., concurring in judgment). There is no occasion to inquire whether promoting such an interest is a permissible legislative goal, however, see *post,* at 636–642, for Tennessee has failed to demonstrate that its views of the dangers of clergy participation in the political process have not lost whatever validity they may once have enjoyed. The essence of the rationale underlying the Tennessee restriction on ministers is that if elected to public office they will necessarily exercise

---

[8] Thus, the courts have sustained government prohibitions on handling venomous snakes or drinking poison, even as part of a religious ceremony, *State ex rel. Swann* v. *Pack,* 527 S. W. 2d 99 (Tenn. 1975), cert. denied, 424 U. S. 954 (1976); *State* v. *Massey,* 229 N. C. 734, 51 S. E. 2d 179, appeal dismissed for want of substantial federal question *sub nom. Bunn* v. *North Carolina,* 336 U. S. 942 (1949), but have precluded the application of criminal sanctions to the religious use of peyote, *People* v. *Woody,* 61 Cal. 2d 716, 394 P. 2d 813 (1964); cf. *Oliver* v. *Udall,* 113 U. S. App. D. C. 212, 306 F. 2d 819 (1962) (not reaching constitutional issue), or the religiously impelled refusal to comply with mandatory education laws past the eighth grade, *Wisconsin* v. *Yoder.*

We need not pass on the conclusions reached in *Pack* and *Woody,* which were not reviewed by this Court. Those cases are illustrative of the general nature of free exercise protections and the delicate balancing required by our decisions in *Sherbert* v. *Verner,* 374 U. S. 398 (1963), and *Wisconsin* v. *Yoder,* when an important state interest is shown.

their powers and influence to promote the interests of one sect or thwart the interests of another, thus pitting one against the others, contrary to the anti-establishment principle with its command of neutrality. See *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970). However widely that view may have been held in the 18th century by many, including enlightened statesmen of that day, the American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.[9]

We hold that § 4 of ch. 848 violates McDaniel's First Amendment right to the free exercise of his religion made applicable to the States by the Fourteenth Amendment. Accordingly, the judgment of the Tennessee Supreme Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

I would hold that § 4 of the legislative call to the Tennessee constitutional convention,[1] to the extent that it incorporates

---

[9] The struggle for separation of church and state in Virginia, which influenced developments in other States—and in the Federal Government— was waged by others in addition to such secular leaders as Jefferson, Madison, and George Mason; many clergymen vigorously opposed any established church. See Stokes 366–379. This suggests the imprecision of any assumption that, even in the early days of the Republic, most ministers, as legislators, would support measures antithetical to the separation of church and state.

[1] Section 4, ch. 848, 1976 Tenn. Pub. Acts, provides, *inter alia:*

"Any citizen of the state who can qualify for membership in the House of Representatives of the General Assembly may become a candidate for

Art. 9, § 1, of the Tennessee Constitution, see *ante,* at 621 n. 1, violates both the Free Exercise and Establishment Clauses of the First Amendment as applied to the States through the Fourteenth Amendment. I therefore concur in the reversal of the judgment of the Tennessee Supreme Court.

## I

The Tennessee Supreme Court sustained Tennessee's exclusion on the ground that it "does not infringe upon religious belief or religious action within the protection of the free exercise clause[, and] that such indirect burden as may be imposed upon ministers and priests by excluding them from the lawmaking process of government is justified by the compelling state interest in maintaining the wall of separation between church and state." 547 S. W. 2d 897, 907 (1977). In reaching this conclusion, the state court relied on two interrelated propositions which are inconsistent with decisions of this Court. The first is that a distinction may be made between "religious belief or religious action" on the one hand, and the "career or calling" of the ministry on the other. The court stated that "[i]t is not religious belief, but the career or calling, by which one is identified as dedicated to the full time promotion of the religious objectives of a particular religious sect, that disqualifies." *Id.,* at 903. The second is that the disqualification provision does not interfere with the free exercise of religion because the practice of the ministry is left unimpaired; only candidacy for legislative office is proscribed.

delegate to the convention upon filing with the County Election Commission of his county a nominating petition containing not less than twenty-five (25) names of legally qualified voters of his or her representative district. Each district must be represented by a qualified voter of that district. In the case of a candidate from a representative district comprising more than one county, only one qualifying petition need be filed by the candidate, and that in his home county, with a certified copy thereof filed with the Election Commission of the other counties of his representative district."

The characterization of the exclusion as one burdening appellant's "career or calling" and not religious belief cannot withstand analysis. Clearly freedom of belief protected by the Free Exercise Clause embraces freedom to profess or practice that belief,[2] even including doing so to earn a livelihood. One's religious belief surely does not cease to enjoy the protection of the First Amendment when held with such depth of sincerity as to impel one to join the ministry.[3]

Whether or not the provision discriminates among religions (and I accept for purposes of discussion the State Supreme

---

[2] That for purposes of defining the protection afforded by the Free Exercise Clause a sharp distinction cannot be made between religious belief and religiously motivated action is demonstrated by Oliver Cromwell's directive regarding religious liberty to the Catholics in Ireland:

" 'As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted.' " Quoted in S. Hook, Paradoxes of Freedom 23 (1962).

See P. Kurland, Religion and the Law 22 (1962).

This does not mean that the right to participate in religious exercises is absolute, or that the State may never prohibit or regulate religious practices. We have recognized that " 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' . . . The conduct or actions so regulated[, however,] have invariably posed some substantial threat to public safety, peace or order." *Sherbert* v. *Verner*, 374 U. S. 398, 403 (1963) (citations omitted), in part quoting *Braunfeld* v. *Brown*, 366 U. S. 599, 603 (1961). But the State does not suggest that the "career or calling" of minister or priest itself poses "some substantial threat to public safety, peace or order"; it is the political participation of those impelled by religious belief to engage in the ministry which the State wishes to proscribe.

[3] The preaching and proselyting activities in which appellant is engaged as a minister, of course, constitute religious activity protected by the Free Exercise Clause. *Kunz* v. *New York*, 340 U. S. 290 (1951) (public worship); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943) (distribution of religious literature).

Court's construction that it does not,[4] *id.*, at 908), it establishes a religious classification—involvement in protected religious activity—governing the eligibility for office, which I believe is absolutely prohibited. The provision imposes a unique disability upon those who exhibit a defined level of intensity of involvement in protected religious activity. Such a classification as much imposes a test for office based on religious conviction as one based on denominational preference. A law which limits political participation to those who eschew prayer, public worship, or the ministry as much establishes a religious test as one which disqualifies Catholics, or Jews, or Protestants. *Wieman* v. *Updegraff*, 344 U. S. 183, 191–192 (1952).[5] Because the challenged provision establishes as a condition of office the willingness to eschew certain protected religious practices, *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), compels the conclusion that it violates the Free Exercise Clause. *Torcaso* struck down Maryland's requirement that an appointee to the office of notary public declare his belief in the existence of God, expressly disavowing "the historically and constitutionally discredited policy of probing religious beliefs by test oaths or limiting public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind

---

[4] It is arguable that the provision not only discriminates between religion and nonreligion, but may, as well, discriminate among religions by depriving ministers of faiths with established, clearly recognizable ministries from holding elective office, while permitting the members of non-orthodox humanistic faiths having no "counterpart" to ministers, 547 S. W. 2d 897, 908 (1977), similarly engaged to do so. Madison warned that disqualification provisions would have precisely such an effect:

"[D]oes it not in fine violate impartiality by shutting the door [against] the Ministers of one Religion and leaving it open for those of every other." 5 Writings of James Madison 288 (G. Hunt ed. 1904).

[5] ". . . Congress could not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.' " 344 U. S., at 191–192, quoting *United Public Workers* v. *Mitchell*, 330 U. S 75, 100 (1947).

of religious concept." *Id.*, at 494 (footnote omitted). That principle equally condemns the religious qualification for elective office imposed by Tennessee.

The second proposition—that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility for office on its abandonment—is also squarely rejected by precedent. In *Sherbert* v. *Verner*, 374 U. S. 398 (1963), a state statute disqualifying from unemployment compensation benefits persons unwilling to work on Saturdays was held to violate the Free Exercise Clause as applied to a Sabbatarian whose religious faith forbade Saturday work. That decision turned upon the fact that "[t]he ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.*, at 404.[6] Similarly, in "prohibiting legislative service because of a person's leadership role in a religious faith," 547 S. W. 2d, at 903, Tennessee's disqualification provision imposed an unconstitutional penalty upon appellant's exercise of his religious faith.[7]

---

[6] *Sherbert* did not state a new principle in this regard. See 374 U. S., at 404–405, n. 6 (collecting authorities); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968).

The Tennessee Supreme Court relied on *Braunfeld* v. *Brown, supra*, at 603–606. Candor compels the acknowledgment that to the extent that *Braunfeld* conflicts with *Sherbert* in this regard, it was overruled.

[7] The "language of the [first] amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation." *Everson* v. *Board of Education*, 330 U. S. 1, 16 (1947) (emphasis in original).

Nor can Tennessee's political exclusion be distinguished from *Sherbert*'s welfare disqualification as the Tennessee court thought, by suggesting that the unemployment compensation involved in *Sherbert* was necessary to sustain life while participation in the constitutional convention is a voluntary activity not itself compelled by religious belief. *Torcaso* answers that contention. There we held that "[t]he fact . . . that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." 367 U. S., at 495–496.

The opinion of the Tennessee Supreme Court makes clear that the statute requires appellant's disqualification solely because he is a minister of a religious faith. If appellant were to renounce his ministry, presumably he could regain eligibility for elective office, but if he does not, he must forgo an opportunity for political participation he otherwise would enjoy. *Sherbert* and *Torcaso* compel the conclusion that because the challenged provision requires appellant to purchase his right to engage in the ministry by sacrificing his candidacy it impairs the free exercise of his religion.

The plurality recognizes that *Torcaso* held "categorically prohibit[ed]," a provision disqualifying from political office on the basis of religious belief, but draws what I respectfully suggest is a sophistic distinction between that holding and Tennessee's disqualification provision. The purpose of the Tennessee provision is not to regulate activities associated with a ministry, such as dangerous snake handling or human sacrifice, which the State validly could prohibit, but to bar from political office persons regarded as deeply committed to religious participation because of that participation—participation itself not regarded as harmful by the State and which therefore must be conceded to be protected. As the plurality recognizes, appellant was disqualified because he "fill[ed] a 'leadership role in religion,' and . . . 'dedicated

[himself] to the full time *promotion* of the religious objectives of a particular religious sect.' 547 S. W. 2d, at 903 (emphasis added)," *ante,* at 627 n. 6. According to the plurality, McDaniel could not be and was not in fact barred for *his* belief in religion, but was barred because of his commitment to persuade or lead others to accept that belief. I simply cannot fathom why the Free Exercise Clause "categorically prohibits" hinging qualification for office on the *act* of declaring a belief in religion, but not on the act of discussing that belief with others.[8] *Ante,* at 626.

---

[8] The plurality's reliance on *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972), is misplaced. The governmental action interfering with the free exercise of religion here differs significantly from that in *Yoder.* There Amish parents challenged a state statute requiring all children within the State to attend school until the age of 16. The parents' claim was that this compulsion interfered with Amish religious teachings requiring the de-emphasis of intellectual training and avoidance of materialistic goals. In sustaining the parents' claim under the Free Exercise Clause, the Court found it necessary to balance the importance of the secular values advanced by the statute, the closeness of the fit between those ends and the means chosen, and the impact an exemption on religious grounds would have on the State's goals, on the one hand, against the sincerity and centrality of the objection to the State's goals to the sect's religious practice, and the extent to which the governmental regulation interfered with that practice, on the other hand. In *Yoder,* the statute implemented by religiously neutral means an avowedly secular purpose which nevertheless burdened respondent's religious exercise. Cases of that nature require a sensitive and difficult accommodation of the competing interests involved.

By contrast, the determination of the validity of the statute involved here requires no balancing of interests. Since, "[b]y its terms, the Tennessee disqualification operates against McDaniel because of his *status* as a 'minister' or 'priest,' " *ante,* at 626–627 (emphasis in original), it runs afoul of the Free Exercise Clause simply as establishing a religious classification as a basis for qualification for a political office. Nevertheless, although my view—that because the prohibition establishes a religious qualification for political office it is void without more—does not require consideration of any compelling state interest, I agree with the plurality that the State did not establish a compelling interest.

## II

The State Supreme Court's justification of the prohibition, echoed here by the State, as intended to prevent those most intensely involved in religion from injecting sectarian goals and policies into the lawmaking process, and thus to avoid fomenting religious strife or the fusing of church with state affairs, itself raises the question whether the exclusion violates the Establishment Clause.[9]   As construed, the exclusion manifests patent hostility toward, not neutrality respecting, religion; forces or influences a minister or priest to abandon his ministry as the price of public office; and, in sum, has a primary effect which inhibits religion.   See *Everson* v. *Board of Education*, 330 U. S. 1, 15–16 (1947); *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 210 (1948); *Torcaso* v. *Watkins*, 367 U. S., at 492–494; *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971); *Meek* v. *Pittenger*, 421 U. S. 349, 358 (1975).

---

[9] Appellant has raised doubt that the purpose ascribed to the provision by the State is, in fact, its actual purpose.  He argues that the actual purpose was to enact as law the religious belief of the dominant Presbyterian sect that it is sinful for a minister to become involved in worldly affairs such as politics, Brief for Appellant 58–59, and that the statute therefore violates the Establishment Clause.  Although the State's ascribed purpose is conceivable, especially in light of the reasons for disqualification advanced by statesmen at the time the provision was adopted, see *ante,* at 622–625, if it were necessary to address appellant's contention we would determine whether that purpose was, in fact, what the provision's framers sought to achieve.  In contrast to the general rule that legislative motive or purpose is not a relevant inquiry in determining the constitutionality of a statute, see *Arizona* v. *California,* 283 U. S. 423, 455 (1931) (collecting cases), our cases under the Religion Clauses have uniformly held such an inquiry necessary because under the Religion Clauses government is generally prohibited from seeking to advance or inhibit religion.  *Epperson* v. *Arkansas,* 393 U. S. 97, 109 (1968); *McGowan* v. *Maryland,* 366 U. S. 420, 431–445, 453 (1961); cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250–251 (1936).  In view of the disposition of this case, it is unnecessary to explore the validity of appellant's contention, however.

The fact that responsible statesmen of the day, including some of the United States Constitution's Framers, were attracted by the concept of clergy disqualification, see *ante,* at 622–625, does not provide historical support for concluding that those provisions are harmonious with the Establishment Clause. Notwithstanding the presence of such provisions in seven state constitutions when the Constitution was being written,[10] the Framers refused to follow suit. That the disqualification provisions contained in state constitutions contemporaneous with the United States Constitution and the Bill of Rights cannot furnish a guide concerning the understanding of the harmony of such provisions with the Establishment Clause is evident from the presence in state constitutions, side by side with disqualification clauses, of provisions which would have clearly contravened the First Amendment had it applied to the States, such as those creating an official church,[11] and limiting political office to Protestants [12] or theistic believers generally.[13] In short, the regime of religious liberty embodied in state constitutions was very different from that established by the Constitution of the United States. When, with the adoption of the Fourteenth Amendment, the strictures of the First Amendment became wholly applicable to the States, see *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940); *Everson* v. *Board of Education, supra,* at 8, earlier conceptions of permissible state action with respect to religion—including those regarding clergy disqualification—were superseded.

Our decisions interpreting the Establishment Clause have aimed at maintaining erect the wall between church and state.

---

[10] See L. Pfeffer, Church, State and Freedom 118 (Rev. ed. 1967); 1 A. Stokes, Church and State in the United States 622 (1950).

[11] S. C. Const., Art. XXXVIII (1778); see generally Md. Declaration of Rights, Art. XXXIII (1776) (authorizing taxation for support of Christian religion).

[12] N. C. Const. § XXXII (1776).

[13] Tenn. Const., Art. VIII, § 2 (1796). The current Tennessee Constitution continues this disqualification. Tenn. Const., Art. 9, § 2 (1870).

State governments, like the Federal Government, have been required to refrain from favoring the tenets or adherents of any religion or of religion over nonreligion,[14] from insinuating themselves in ecclesiastical affairs or disputes,[15] and from establishing programs which unnecessarily or excessively entangle government with religion.[16]   On the other hand, the Court's decisions have indicated that the limits of permissible governmental action with respect to religion under the Establishment Clause must reflect an appropriate accommodation of our heritage as a religious people whose freedom to develop and preach religious ideas and practices is protected by the Free Exercise Clause.[17]   Thus, we have rejected as unfaithful to our constitutionally protected tradition of religious liberty, any conception of the Religion Clauses as stating a "strict no-aid" theory [18] or as stating a unitary principle, that "religion may not be used as a basis for classification for purposes of governmental action, whether that action be the conferring of rights or privileges or the imposition of duties or obliga-

---

[14] *Epperson* v. *Arkansas, supra; Abington School Dist.* v. *Schempp,* 374 U. S. 203 (1963); *Engel* v. *Vitale,* 370 U. S. 421 (1962); *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203 (1948).

[15] *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U. S. 696 (1976); *Presbyterian Church* v. *Hull Presbyterian Church,* 393 U. S. 440 (1969); *Kedroff* v. *Saint Nicholas Cathedral,* 344 U. S. 94 (1952); *United States* v. *Ballard,* 322 U. S. 78, 86 (1944); see *Watson* v. *Jones,* 13 Wall. 679, 727 (1872).

[16] *New York* v. *Cathedral Academy,* 434 U. S. 125 (1977); *Meek* v. *Pittenger,* 421 U. S. 349 (1975); *Levitt* v. *Committee for Public Education,* 413 U. S. 472 (1973); *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973); *Lemon* v. *Kurtzman,* 411 U. S. 192 (1973) (*Lemon II*); *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971) (*Lemon I*).

[17] *E. g., Abington School Dist.* v. *Schempp,* 374 U. S., at 212–214; *id.,* at 295 (BRENNAN, J., concurring); *id.,* at 306 (Goldberg, J., concurring); *id.,* at 311–318 (STEWART, J., dissenting); *Everson* v. *Board of Education,* 330 U. S., at 8.

[18] Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, Part II, 81 Harv. L. Rev. 513, 514 (1968).

tions." P. Kurland, Religion and the Law 18 (1962); accord, *id.,* at 112. Such rigid conceptions of neutrality have been tempered by constructions upholding religious classifications where necessary to avoid "[a] manifestation of . . . hostility [toward religion] at war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion." *Illinois ex rel. McCollum* v. *Board of Education, supra,* at 211–212. This understanding of the interrelationship of the Religion Clauses has permitted government to take religion into account when necessary to further secular purposes unrelated to the advancement of religion,[19] and to exempt, when possible, from generally applicable governmental regulation individuals whose religious beliefs and practices would otherwise thereby be infringed,[20] or to create without state involvement an atmosphere in which voluntary religious exercise may flourish.[21]

Beyond these limited situations in which government may take cognizance of religion for purposes of accommodating our traditions of religious liberty, government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits.[22] "State power is no more to be used so as to handicap religions than it is to favor them." *Everson* v. *Board of Education,* 330 U. S., at 18.

Tennessee nevertheless invokes the Establishment Clause to excuse the imposition of a civil disability upon those deemed

---

[19] See, *e. g., Everson* v. *Board of Education, supra; McGowan* v. *Maryland, supra;* Giannella, *supra* n. 18, at 527–528, 532, 538–560 (discussion of "secularly relevant religious factor").

[20] *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Sherbert* v. *Verner,* 374 U. S., at 409; *id.,* at 414–417 (STEWART, J., concurring in result); L. Tribe, American Constitutional Law § 14–4 (1978); Katz, Freedom of Religion and State Neutrality, 20 U. Chi. L. Rev. 426 (1953).

[21] *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952); *Quick Bear* v. *Leupp,* 210 U. S. 50 (1908). See generally *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970).

[22] Accord, Giannella, *supra* n. 18, at 527.

to be deeply involved in religion. In my view, that Clause will not permit, much less excuse or condone, the deprivation of religious liberty here involved.

Fundamental to the conception of religious liberty protected by the Religion Clauses is the idea that religious beliefs are a matter of voluntary choice by individuals and their associations,[23] and that each sect is entitled to "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952). Accordingly, religious ideas, no less than any other, may be the subject of debate which is "uninhibited, robust, and wide-open . . . ." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964). Government may not interfere with efforts to proselyte or worship in public places. *Kunz* v. *New York,* 340 U. S. 290 (1951). It may not tax the dissemination of religious ideas. *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943). It may not seek to shield its citizens from those who would solicit them with their religious beliefs. *Martin* v. *City of Struthers,* 319 U. S. 141 (1943).

That public debate of religious ideas, like any other, may arouse emotion, may incite, may foment religious divisiveness and strife does not rob it of constitutional protection.[24] *Cantwell* v. *Connecticut,* 310 U. S., at 309–310; cf. *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 (1949). The mere fact that a purpose of the Establishment Clause is to reduce or eliminate religious divisiveness or strife, does not place religious discussion, association, or political participation in a status less preferred than rights of discussion, association, and political participation generally. "Adherents of particular faiths and individual churches frequently take strong positions on public

---

[23] *Id.,* at 516–522.

[24] "Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth." *Gitlow* v. *New York,* 268 U. S. 652, 673 (1925) (Holmes, J., dissenting).

issues including . . . vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right." *Walz* v. *Tax Comm'n,* 397 U. S. 664, 670 (1970).

The State's goal of preventing sectarian bickering and strife may not be accomplished by regulating religious speech and political association. The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities. Cf. *Wieman* v. *Updegraff,* 344 U. S. 183 (1952). Government may not inquire into the religious beliefs and motivations of officeholders—it may not remove them from office merely for making public statements regarding religion, or question whether their legislative actions stem from religious conviction. Cf. *Bond* v. *Floyd,* 385 U. S. 116 (1966).

In short, government may not as a goal promote "safe thinking" with respect to religion and fence out from political participation those, such as ministers, whom it regards as overinvolved in religion. Religionists no less than members of any other group enjoy the full measure of protection afforded speech, association, and political activity generally. The Establishment Clause, properly understood, is a shield against any attempt by government to inhibit religion as it has done here; *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 222 (1963). It may not be used as a sword to justify repression of religion or its adherents from any aspect of public life.[25]

---

[25] "In much the same spirit, American courts have not thought the separation of church and state to require that religion be totally oblivious to government or politics; church and religious groups in the United States have long exerted powerful political pressures on state and national legislatures, on subjects as diverse as slavery, war, gambling, drinking, prostitution, marriage, and education. To view such religious activity as suspect, or to regard its political results as automatically tainted, might be incon-

Our decisions under the Establishment Clause prevent government from supporting or involving itself in religion or from becoming drawn into ecclesiastical disputes.[26] These prohibitions naturally tend, as they were designed to, to avoid channeling political activity along religious lines and to reduce any tendency toward religious divisiveness in society. Beyond enforcing these prohibitions, however, government may not go. The antidote which the Constitution provides against zealots who would inject sectarianism into the political process is to subject their ideas to refutation in the marketplace of ideas and their platforms to rejection at the polls. With these safeguards, it is unlikely that they will succeed in inducing government to act along religiously divisive lines, and, with judicial enforcement of the Establishment Clause, any measure of success they achieve must be short-lived, at best.

MR. JUSTICE STEWART, concurring in the judgment.

Like MR. JUSTICE BRENNAN, I believe that *Torcaso* v. *Watkins,* 367 U. S. 488, controls this case. There, the Court held that Maryland's refusal to commission Torcaso as a notary public because he would not declare his belief in God violated the First Amendment, as incorporated by the Fourteenth. The offense against the First and Fourteenth Amendments lay not simply in requiring an oath, but in "limiting public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind of religious concept." *Id.,* at 494. As the Court noted: "The fact . . . that a person is not compelled to hold public office cannot possibly be

---

sistent with first amendment freedoms of religious and political expression—and might not even succeed in keeping religious controversy out of public life, given the 'political ruptures caused by the alienation of segments of the religious community.' " L. Tribe, *supra* n. 20, § 14–12, pp. 866–867 (footnotes omitted).

[26] See authorities cited nn. 14–16, *supra.*

an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." *Id.,* at 495–496. Except for the fact that Tennessee bases its disqualification not on a person's statement of belief, but on his decision to pursue a religious vocation as directed by his belief, that case is indistinguishable from this one—and that sole distinction is without constitutional consequence.*

MR. JUSTICE WHITE, concurring in the judgment.

While I share the view of my Brothers that Tennessee's disqualification of ministers from serving as delegates to the State's constitutional convention is constitutionally impermissible, I disagree as to the basis for this invalidity. Rather than relying on the Free Exercise Clause, as do the other Members of the Court, I would hold ch. 848, § 4, of 1976 Tenn. Pub. Acts unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

The plurality states that § 4 "has encroached upon Mc-Daniel's right to the free exercise of religion," *ante,* at 626, but fails to explain in what way McDaniel has been deterred in the observance of his religious beliefs. Certainly he has not felt compelled to abandon the ministry as a result of the challenged statute, nor has he been required to disavow any of his

---

*In *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304, this Court recognized that "the [First] Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." This distinction reflects the judgment that, on the one hand, government has no business prying into people's minds or dispensing benefits according to people's religious beliefs, and, on the other, that acts harmful to society should not be immune from proscription simply because the actor claims to be religiously inspired. The disability imposed on McDaniel, like the one imposed on Torcaso, implicates the "freedom to believe" more than the less absolute "freedom to act." As did Maryland in *Torcaso,* Tennessee here has penalized an individual for his religious status—for what he is and believes in—rather than for any particular act generally deemed harmful to society.

religious beliefs. Because I am not persuaded that the Tennessee statute in any way interferes with McDaniel's ability to exercise his religion as he desires, I would not rest the decision on the Free Exercise Clause, but instead would turn to McDaniel's argument that the statute denies him equal protection of the laws.

Our cases have recognized the importance of the right of an individual to seek elective office and accordingly have afforded careful scrutiny to state regulations burdening that right. In *Lubin* v. *Panish*, 415 U. S. 709, 716 (1974), for example, we noted:

> "This legitimate state interest, however, must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters."

Recognizing that "the rights of voters and the rights of candidates do not lend themselves to neat separation . . . ," *Bullock.* v. *Carter*, 405 U. S. 134, 143 (1972), the Court has required States to provide substantial justification for any requirement that prevents a class of citizens from gaining ballot access and has held unconstitutional state laws requiring the payment of prohibitively large filing fees,[1] requiring the payment of even moderate fees by indigent candidates,[2] and

---

[1] *Bullock* v. *Carter*, 405 U. S. 134 (1972).

[2] *Lubin* v. *Panish*, 415 U. S. 709 (1974).

having the effect of excluding independent and minority party candidates from the ballot.[3]

The restriction in this case, unlike the ones challenged in the previous cases, is absolute on its face: There is no way in which a Tennessee minister can qualify as a candidate for the State's constitutional convention. The State's asserted interest in this absolute disqualification is its desire to maintain the required separation between church and state. While the State recognizes that not all ministers would necessarily allow their religious commitments to interfere with their duties to the State and to their constituents, it asserts that the potential for such conflict is sufficiently great to justify § 4's candidacy disqualification.

Although the State's interest is a legitimate one, close scrutiny reveals that the challenged law is not "reasonably necessary to the accomplishment of . . ." that objective. *Bullock, supra,* at 144. All 50 States are required by the First and Fourteenth Amendments to maintain a separation between church and state, and yet all of the States other than Tennessee are able to achieve this objective without burdening ministers' rights to candidacy. This suggests that the underlying assumption on which the Tennessee statute is based—that a minister's duty to the superiors of his church will interfere with his governmental service—is unfounded. Moreover, the rationale of the Tennessee statute is undermined by the fact that it is both underinclusive and overinclusive. While the State asserts an interest in keeping religious and governmental interests separate, the disqualification of ministers applies only to legislative positions, and not to executive and judicial offices. On the other hand, the statute's sweep is also overly broad, for it applies with equal force to those ministers whose religious beliefs would not prevent them from properly discharging their duties as constitutional convention delegates.

---

[3] *Williams* v. *Rhodes,* 393 U. S. 23 (1968).

The facts of this case show that the voters of McDaniel's district desired to have him represent them at the limited constitutional convention. Because I conclude that the State's justification for frustrating the desires of these voters and for depriving McDaniel and all other ministers of the right to seek this position is insufficient, I would hold § 4 unconstitutional as a violation of the Equal Protection Clause.