EDITH H. JONES, Circuit Judge,
with whom JERRY E. SMITH, BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges,
dissenting from the denial of rehearing en banc:
This is an equal access case. The question is whether public authorities may exclude “religious services or religious instruction” as after-hour rental uses of school facilities, when they have permitted all other uses consistent with the “welfare of the public,” except partisan political activity [1] and for-profit fimd-raising. In upholding this blatant discrimination against religious speech, a panel of our court seriously erred. Campbell v. St. Tammany Parish Sch. Bd., 206 F.3d 482 (5th Cir.2000). Its opinion conflicts with the Supreme Court’s equal access and viewpoint discrimination cases, decisions of five other circuit courts, and previous Fifth Circuit cases. We dissent from the denial of en bane review.
The facts are straightforward. The St. Tammany Parish School Board allows after-hours use of its facilities for civic, social and recreational purposes, subject to the exceptions noted above. Over sixty buildings have been opened to hundreds of community groups.[2] But Sally Campbell and the Christian Coalition were, under this policy, denied permission to use the facilities to discuss educational, family and political issues, to pray about those issues, to teach the Bible with regard to those issues, and to worship God in prayer and music.
As the panel noted, this case turns initially on what type of expressive forum the school board created. When public facilities are available “for indiscriminate use by the general public”, a designated public forum exists, and content-based exclusion of speakers must survive strict scrutiny review. Perry Education Ass’n. v. Perry Local Educators’ Ass’n., 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983). *946 If, however, because of the narrow scope of its intended use, a forum is non-public, then reasonable, viewpoint-neutral content restrictions may be imposed. See, e.g. Perry, 460 U.S. at 47, 103 S.Ct. at 956 (teachers’ mailboxes are a nonpublic forum); Lamb’s Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (excluding religious viewpoint from access to after-hours use of school facilities is unconstitutional).
The panel’s first error lies in its allowing St. Tammany’s policy to dictate what type of forum exists. The panel observes the Board’s written limits on use of school facilities and concludes that, because political and for-profit fundraising activities are prohibited as well as religious instruction or worship, the Board was not solely motivated to discriminate against religious speech. Further, the district policy restricts “more types of uses” than a policy that the Second Circuit held did not create a public forum. Bronx Household of Faith v. Community Sch. Dist. No. 10., 127 F.3d 207, 210 (2nd Cir.1997). Implicitly, the panel holds that the panoply of what the school district permits is less important to the forum determination than the speech it excludes.[3]
With due respect, the panel is looking through the wrong end of the telescope. Such a narrow view of the conditions under which a designated public forum can arise is incorrect. “The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place.” Widmar v. Vincent, 454 U.S. 263, 267-68, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981) (emphasis added). See also Perry, 460 U.S. at 45, 103 S.Ct. at 955. All that is required is that the forum be “generally open” to the public: “Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.” Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (emphasis added). See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988)(pub-lic facilities opened for indiscriminate use by the general public “or by some segment of the public” are designated public fora).
Also pertinent for present purposes, the Supreme Court has strongly suggested that a designated public forum is created when a school district, which purports to prohibit after-hours “religious uses” of public facilities, nevertheless allows access by a wide variety of private organizations, including some that may have carried out religious purposes. See Lamb’s Chapel, 508 U.S. at 391, 113 S.Ct. at 2146 (1993);[4] see also Bronx Household, 127 F.3d 207, 218 (2nd Cir.1997) (Cabranes, J., concurring and dissenting) (noting that Bronx Household is bound to non-public forum description of school district policy by cir- *947 euit precedent, notwithstanding anvil-like hint” in Lamb’s Chapel).
Contrary to the panel decision, most circuit courts have recognized that the government “create[s] a public forum by allowing diverse groups to use its auditorium.” Concerned Women for America, Inc. v. Lafayette County, 883 F.2d 32, 34 (5th Cir.1989). That a public school rather than a university or library or ballpark is the facility in question makes no difference. See Grace Bible Fellowship v. Maine School Admin. Distict No. 5, 941 F.2d 45 (1st Cir.1991) (Breyer, J., on the panel); Gregoire v. Centennial Sch. Dist., 907 F.2d 1366 (3rd Cir.1990). It is what the school district “does, not what it says” that determines the type of forum. Gregoire, 907 F.2d at 1374 (citing Board of Education v. Mergens, 496 U.S. 226, 244, 110 S.Ct. 2356, 2369, 110 L.Ed.2d 191 (1990)). Were it otherwise, a public body could unilaterally narrow a designated public forum so as to exclude disfavored groups, cynically circumventing the Supreme Court’s public forum jurisprudence. This court and others have thwarted such obvious machinations. Gregoire, 907 F.2d at 1378; Hays County Guardian v. Supple, 969 F.2d 111, 117-18 (5th Cir.1992).
Since the broad “welfare of the community” standard and the actual use of the facilities, rather than the district’s exclusion of three categories of speech, determine the type of forum, it should have been plain that the St. Tammany policy created a limited public forum. See, e.g., Grace Bible Fellowship, 941 F.2d at 47; Gregoire, 907 F.2d at 1374, 1375. Cases in which non-public fora were found, by contrast, were those in which the forum is not dedicated to general debate or the free exchange of ideas, or the nature of the property is “inconsistent with expressive activity.” Cornelius v. NAACP Legal Defense and Educational Fund, 473 U.S. 788, 803, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985).[5] Neither of those descriptions accords with St. Tammany’s policy or practice.
Under the proper test, the district facilities were open “indifferently”[6] for use by private groups. The content-based exclusion of religious speakers from access to the facilities is censorship pure and simple. Grace Bible Fellowship, 941 F.2d at 47. As the Supreme Court explains,
If a state refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion. “The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.”
Board of Education of Westside Community Schools v. Mergens, 496 U.S. 226, 248, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990) (citing McDaniel v. Paty, 435 U.S. 618, 641, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring in judgment)) (emphasis added).[7]
*948 The panel’s second error was to construe the board’s policy, if it legitimately created a non-public forum, as maintaining both a reasonable and viewpoint-neutral content restriction against religious worship and instruction. In a nonpublic forum, “content discrimination may be permissible if it preserves the purposes of that limited forum, [but] viewpoint discrimination ... is presumed impermissible when directed against speech otherwise within the forum’s limitations.” Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829-30, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995).
The panel opinion says nothing about the policy’s reasonableness, which must be judged in light of the forum’s general “welfare of the public” standard. The omission is particularly curious given the Supreme Court’s criticism in Lamb’s Chapel that the lower court there had failed to examine the reasonableness of a restriction against using school buildings after-hours for “religious purposes.” One would suppose that without a finding of its reasonableness vis á vis the scope of the forum, a content restriction is doomed. Lamb’s Chapel, 508 U.S. at 393 n. 6, 113 S.Ct. at 2147 n. 6.
The policy is, in any event, unreasonable. Perhaps it was motivated by fear that public schools would become the font of off-hours sectarian activity, but there is no record evidence of this. If, on the other hand, the fears relate to excessive use of the facilities, the district could review its custodial regulations to assure that all off-hours costs were recovered. But there is no evidence of these fears, either. Compare Fairfax Cov. Church v. Fairfax County School Board, 17 F.3d 703 (4th Cir.1994). Finally, no legitimate Establishment Clause violation occurs from allowing religious groups equal access to after-hours rentals.[8]
The crux of the issue is this: when measured against the “welfare of the public standard,” how can the prohibition of religious worship or instruction be anything other than viewpoint discrimination? Even the Second Circuit understood that religious worship services are “the ultimate in speech from a religious viewpoint.” Bronx Household, 127 F.3d at 215. To describe the exclusion as covering “religious activity” somehow outside the pale of the community’s welfare makes no sense. Such a distinction not only invites active censorship by the St. Tammany School Board — e.g., does a prayer or Christian exhortation at the Fellowship of Christian Athletes meeting make it a religious worship service?[9] — but it flatly discriminates against those who practice, rather than simply profess or talk about, religion. Both of these effects have been condemned by the Supreme Court’s equal access jurisprudence.
Most recently, the Court ruled that when a university funds student publications generally, and does not exclude religion as a subject matter, it is unconstitutional for the school to discriminate based on some speaker’s religious viewpoint. Rosenberger, supra. Allowing the Fellowship of Christian Athletes, the Knights of Columbus and other religious groups to use the St. Tammany facilities demonstrates, along with the board’s broad written access policy, that religious subject matter is not excluded from after-hours rentals. Rosenberger made plain that “the guarantee of neutrality is respected, not offended, when the government, following *949 neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.” Rosenberger, 515 U.S. at 839, 115 S.Ct. at 2521; see also 515 U.S. at 846, 115 S.Ct. at 2525 (O’Connor, J., concurring) (emphasizing that exclusion of religious groups would evince hostility to religion). Rosenberger condemned the imposition of viewpoint distinctions by the university that would inevitably lead to “governmental censorship, to ensure that all student writings and publications meet some baseline standard of secular orthodoxy.” 515 U.S. at 844, 115 S.Ct. at 2524. So it is in this case. Rosen-berger then repeated the description of this danger from one of the Court’s first equal access cases:
[T]he dissent fails to establish that the distinction [between “religious” speech and speech “about” religion] has intelligible content. There is no indication when “singing hymns, reading scripture, and teaching biblical principals” cease to be “singing, teaching, and reading” — all apparently forms of “speech,” despite their religious subject matter — and become unprotected “worship.” [E]ven if the distinction drew an arguably principled line, it is highly doubtful it would lie within the judicial competence to administer. Merely to draw the distinction would require the university — and ultimately the courts — to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.
Rosenberger, 515 U.S. at 845, 115 S.Ct. at 2524 (citing Widmar, 454 U.S. at 269-70, n. 6, 102 S.Ct. at 274, n. 6) (citations omitted).[10]
To paraphrase one court, the panel opinion would allow atheists to put on a program denouncing religion or anti-Semites to sponsor a rant against Judaism, but it would not allow religious believers of any stripe to convene or instruct the faithful in this forum. See Church on the Rock, 84 F.3d at 1279; see also Grace Bible Fellowship, 941 F.2d at 47. This is the very essence of viewpoint discrimination.
It is unfortunate for the citizens of the Fifth Circuit that this court has seen fit to retreat from equal treatment of religious speech and to deviate from fifteen years of consistent Supreme Court jurisprudence on the subject. The St. Tammany school board was not required to open its facilities for the “welfare of the public.” Once it did so, however, it could not arbitrarily discriminate against religious speakers. We dissent from the denial of rehearing en banc.

. No issue of partisan political use of the school buildings is before us in this case.

. These include the Fellowship of Christian Athletes; Ml. Zion Methodist Church Annual Tea; Wildlife and Fisheries Hunter safety training; Southeastern University Community Education classes; Mary Dee’s Dance Studio recital; church black history program; Young Marines meeting; Knights of Columbus meeting; Pride-Rape defense program, etc. The St. Tammany School facilities have been used for a variety of other purposes, such as: Righteous Rumble Youth Conference; Brugier Homeowner's Association Candidate Forum; Northshore DARE Association meeting; Willow Wood Homeowner's Association meeting; Folsom Native Plant Society meeting; Northwest St. Tammany Civic Association meeting; Primary Colors Pre-school Christmas program; Relay for Life Cancer fundraiser; Pearl River Volunteer Fire Department banquet; First Church of God banquet; Drainage Board meeting; Gold Wing Riders benefit; Boy and Girl Scouts meetings; Young Blood International seminar; wedding reception; EPA meeting; Kiwanis Club breakfast; Sister-to-Sister conference; and Commission on Families fair.

. For reasons that are not clear, the panel in its lengthy order on panel rehearing, no longer perceives this as a ''minimally sufficient” case to maintain the school buildings' status as a non-public forum. See Campbell, 206 F.3d at 487.

. "The Church argued below that because under Rule 10 of the rules issued by the District, school property could be used for ‘social, civic, and recreational' purposes, the District had opened its property for such a wide variety of communicative purposes that restrictions on communicative uses of the property were subject to the same constitutional limitations as restrictions in traditional public forums such as parks and sidewalks. Hence, its view was that subject matter or speaker exclusions on District property were required to be justified by a compelling state interest and to be narrowly drawn to achieve that end.... The argument has considerable force, for the District's property is heavily used by a wide variety of public organizations, including some that presented a 'close question,' which the Court of Appeals resolved in the District's favor, as to whether the District had in fact already opened its property for religious uses.” Lamb's Chapel, id. at 391, 113 S.Ct. at 2146 (footnote omitted) (emphasis added).

.The various cases finding that a non-public forum existed are clearly distinguishable from the present factual situation. See Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (limited access to advertising space on buses); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base is a non-public forum); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (jailhouse grounds not public forum); Cornelius, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (federal workplace exists to accomplish the business of the employer and is thus not open to all charitable organizations). See also Perry, 460 U,S. at 47, 103 S.Ct. at 956.

. Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd., 578 F.2d 1122 (5th Cir.1978).

. See also Widmar, 454 U.S. at 269, 102 S.Ct. at 274 (if the government creates a "generally ' open forum,” it cannot discriminate against groups “engag[ing] in religious worship and discussion [since] [t]hese are forms of speech and association protected by the First Amendment”). So much for the panel’s attempted distinction between religious meetings and "religious instruction and worship.”

. “It does not violate the Establishment Clause for a public [school] to grant access to its facilities on a religion-neutral basis to a wide spectrum of ... groups, including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercise.’’ Rosenberger, 515 U.S. at 842, 115 S.Ct. at 2523. Since the facilities are used after-hours, there is no threat of a captive audience; since the facilities are used by a variety of groups, there is no threat of the schools endorsing religion: "[B]y creating a forum the [school] does not thereby endorse or promote any of the particular ideas aired there.” Widmar, 454 U.S. at 271 n. 10, 102 S.Ct. at 275 n. 10.

. See n.2 supra.

. See also Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1278 (10th Cir.1996) (overturning a prohibition against using an otherwise publicly available senior citizens’ center for religious worship). The court held that:
... even if the City had not previously opened the Senior Centers to presentations on religious subjects, its policy would still amount to viewpoint discrimination. Any prohibition of sectarian instruction where other instruction is permitted is inherently non-neutral with respect to viewpoint. Instruction becomes "sectarian” when it manifests a preference for a set of religious beliefs. Because there is no non-religious sectarian instruction (and indeed the concept is a contradiction in terms), a restriction prohibiting sectarian instruction intrinsically favors secularism at the expense of religion. Therefore, we conclude that the City's policy constitutes viewpoint determination.
See also Good News/Good Sports Club v. School District of the City of Ladue, 28 F.3d 1501, 1507 (8th Cir.1994).