**G. Hugh WAMBLE, Plaintiff,**

**and**

**Verline Cobbins, et al.,
Intervenors-Plaintiffs,**

**v.**

**Terrel H. BELL, Secretary of the United
States Department of Education, et
al., Defendants,**

**and**

**Dempster and Pauline Ferguson, et al.,
Intervenors-Defendants.**

**No. 77–0254–CV–W–8.**

United States District Court,
W.D. Missouri, W.D.

Nov. 28, 1984.

As Amended Dec. 14, 1984.

---

G. Hugh Wamble, Kansas City, Mo., pro se.

Lee Boothby, Berrien Springs, Mich., for intervenors-plaintiffs; William T. Smith, III, Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.

Linda Cromwell, U.S. Dept. of Justice, Civ. Div., Washington, D.C., Judith M. Strong, U.S. Dept. of Justice, Kansas City, Mo., for defendants.

Louis C. DeFeo, Jr., Jefferson City, Mo., Charles H. Wilson, Williams & Connolly, Washington, D.C., for intervenors-defendants.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

### Prologue

This multi-faceted constitutional challenge to a significant federal educational program was first filed in this court in April of 1977. It has made its tortious way through three divisions and before as many judges of this court, finally coming to rest in this division in late 1981. Before assignment of the case to this division, discovery and trial preparation proceeded apace until a stay was entered by Judge Collinson on March 30, 1979, pending the outcome of a similar case, *National Coalition for Public Education and Religious Liberty v. Harris*, 489 F.Supp. 1248 (S.D.N.Y.1980) (hereinafter referred to as *Pearl*). *Pearl* was decided on April 18, 1980, the final stay order was lifted, and extensive discovery was conducted from that time until transfer here. The court placed counsel on what was characterized as a "fast track" in late 1981 to complete discovery and trial preparation, and after four and a half years of pendency the case finally came to trial on August 2, 1982. During the next five months the court held twenty-three separate days of trial.

After trial and extensive post-trial briefing there began a series of suggestions by one party or the other that the court delay its decision in the case until the opinions in several cases pending elsewhere were handed down. The last of such cases was *Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d 48 (1984), *hearing pending*, — U.S. —, 105 S.Ct. 241, 83 L.Ed.2d 180 (1984),[1] and it is now suggested that action by this court should be further delayed pending the Supreme Court's decision in *Felton*, certiorari having been granted on October 1, 1984. While that decision may very well affect the result reached here, the court is convinced that the time has come to rule and let this decision assume its proper role in this ongoing drama.

### Introduction

Before the court is an Establishment Clause challenge to federal legislation, Ti-

1. Judge Friendly of the Second Circuit in *Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d 48, *hearing pending*, — U.S. —, 105 S.Ct. 241, 83 L.Ed.2d 180 (1984), provided a chronological discussion of the Supreme Court's relevant decisions with regard to government aid to religious schools. In fact, *Felton* is strikingly similar in its facts and issues to the case at bar and this court finds Judge Friendly's exposition of the development of the law to be thorough and persuasive. We, therefore, adopt his analysis, limiting this discussion to the law as it relates to the facts before us.

tle I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 *et seq.* (hereinafter Title I), designed to provide remedial education services for public and nonpublic school children who reside in low-income areas and whose scholastic or testing records demonstrate a need for such services. This action was originally brought by Dr. Hugh Wamble, an individual taxpayer. Thirty-two other taxpayers and seven parents of public school students entitled to receive Title I assistance later were permitted to intervene as plaintiffs (hereinafter with Dr. Wamble jointly referred to as plaintiffs unless otherwise specified) against the defendants named by Dr. Wamble, to wit: the Secretary of the United States Department of Education (hereinafter USDOE or the Secretary),[2] Blue Hills Home Corporation (hereinafter BHHC), the entity contracting with USDOE to provide Title I services for Missouri's nonpublic school students, and BHHC's Executive Director John P. Cole. Thirteen parents of students in religiously affiliated schools were permitted to intervene as defendants (hereinafter with the originally named defendants jointly referred to as defendants unless otherwise specified). Jurisdiction is appropriately invoked pursuant to 28 U.S.C. §§ 1331, 1391, 2201, and 2202.

Plaintiffs challenge the Secretary's decision to invoke the "bypass provision" of the Act in question, 20 U.S.C. § 3806(b), which authorizes payment of funds to an independent contractor who provides services in parochial schools in jurisdictions where the public education authority either will not or cannot administer the funds in parochial schools. Plaintiffs condemn the contractor, BHHC, as a religiously affiliated and controlled organization, seek to enjoin permanently the operation of Title I in Missouri's nonpublic schools and request a declaratory judgment that the bypass statute on its face and as administered violates the First Amendment prohibition against establishment of religion.

Specifically, this case presents two fundamental questions: (1) Does this federal statute which authorizes the payment of funds to an independent contractor with directions to that contractor to provide remedial services for educationally deprived children residing in low-income areas and attending nonpublic schools, the majority of which are church-affiliated, on its face violate the Establishment Clause of the First Amendment to the United States Constitution? (2) Assuming *arguendo*, that Title I is not unconstitutional on its face, does Title I as administered on the premises of Missouri's parochial schools during the school day in rooms largely devoid of religious symbols by teachers paid and supervised by this independent contractor, nevertheless violate the religious neutrality and entanglement principles enunciated in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) and *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975)? After waiting for and studying opinions from other jurisdictions involving similar questions and upon careful review of the record made in this twenty-three day trial, this court answers the first question in the negative and the second question in the affirmative.

### Background

Congress enacted Title I of the Elementary and Secondary Education Act of 1965, Pub.L. 89–10, 79 Stat. 27 (codified as amended 20 U.S.C. § 2701 *et seq.*) for the express purpose of funding locally administered compensatory learning programs—remedial education to benefit *all* educationally deprived children residing in low-income areas. *See* S.Rep. No. 146, 89th Cong., 1st Sess., *reprinted in* [1965] United States Code Cong. and Ad.News, pp. 1446, 1450. The Secretary administers Title I at the federal level, state educational agencies (SEA) normally implement it, and

---

**2.** Prior to the May, 1980, creation of the Department of Education, the Commissioner of the United States Office of Education administered Title I. Because this case was filed prior to the existence of the Department of Education, the court could have referred to the Title I administrator at the federal level as either the Secretary or the Commissioner.

local educational agencies (LEA) customarily operate and manage the program on a day-to-day basis. 20 U.S.C. § 3801 (West Supp.1982).

All students who are educationally deprived, defined as below age-level in academic performance, and who reside in a low-income area are eligible to participate in a Title I program, 20 U.S.C. §§ 2722, 3804, 3805, 3806. To receive federal funds to finance Title I programs for children in parochial schools, an SEA must file an assurance with the Secretary that a nonsectarian agency will control the funds and that the SEA will assure proper disbursement of funds through fiscal control. 20 U.S.C. § 3876(a). The related LEAs in turn file with the SEA applications describing the project and assuring the SEA that it will provide for equitable participation of all eligible children in the area regardless of whether they attend public or nonpublic schools. 20 U.S.C. § 3805(a) and (b). *See also* 20 U.S.C. §§ 2740; 3806(a), (b); 47 Fed.Reg. 52, 350 (1982) (to be codified at 34 C.F.R. § 200.70). Each LEA is responsible for insuring that the needs of nonpublic and public school children are met on a basis comparable in quality, scope, and opportunity, and that expenditures are equal.[3] 20 U.S.C. §§ 2740(a); 3806; 47 Fed.Reg. 52,350. In addition, Title I mandates that instruction supplement, not supplant, regular classroom instruction, 20 U.S.C. § 3807(b), and that "[n]othing in [Title I or its revised version effective October 1, 1982, Chapter I, 20 U.S.C. § 3801 *et seq.*] shall be construed to authorize the making of any payment ... for religious worship or instruction." 20 U.S.C. § 3384.

Early Title I benefits for nonpublic school children in Missouri consisted of equipment and materials without instruction while public school children received on-site remedial instruction in reading, math, and verbal arts. In *Barrera v. Wheeler,* 475 F.2d 1338, 1353 (8th Cir.1973), the Eighth Circuit held that the Missouri Commission of Education and the Missouri Board of Education failed to provide comparable services to both public and nonpublic school children.[4] Pending appeal to the Supreme Court, the Honorable William R. Collinson of this district issued an injunction ordering the LEAs to provide comparable services to nonpublic school children—remedial instruction in the nonpublic schools by public teachers during the regular school day. During the 1973–74 and 1974–75 school years, eligible children were released from their regular classes to attend a separate Title I class, known as "pull-out,"—which supplemented rather than supplanted regular instruction.

In 1974, the Supreme Court affirmed the Eighth Circuit, holding that the services provided to the nonpublic school students "were plainly inferior, both qualitatively and quantitatively." *Wheeler v. Barrera,* 417 U.S. 402, 415, 94 S.Ct. 2274, 2282, 41 L.Ed.2d 159 (1974). The court declined, however, to decide whether Title I's mandate for "equitable participation" was a requirement of on-premise instruction or whether such on-premise instruction would be constitutional. Instead, it remanded the case to Judge Collinson to develop guidelines designed to assure LEA compliance in Missouri with Title I.

Later in 1974, Congress amended Title I to remedy inequities allegedly found in Missouri and elsewhere caused by state or local laws which prohibited state agencies from offering equitable participation to eligible nonpublic school children. It authorized the Secretary in such a circumstance to *bypass* state and local authorities and to provide Title I services directly to educa-

---

**3.** The "equal expenditure" requirement became a part of the statute in the 1978 amendments to Title I found in Pub.L. No. 95–561, 92 Stat. 2153 (codified at 20 U.S.C. § 2740(a)).

**4.** The history of litigation over Title I in Missouri is well-documented. During the 1970's, the court in *Barrera v. Wheeler,* 531 F.2d 402 (8th Cir.1976) referred to the "apparently endless

legal battle" over this statutory program. Questions about Title I have been addressed in *Barrera v. Wheeler,* 441 F.2d 795 (8th Cir.1971); *Barrera v. Wheeler,* 475 F.2d 1338 (8th Cir.1973); *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974); *Mallory v. Barrera,* 544 S.W.2d 556 (Mo.1976) (en banc).

tionally deprived nonpublic school children through the use of independent contractors unrelated to state or local governmental agencies.[5] Pub.L. No. 93–380, 88 Stat. 484 (originally codified at 20 U.S.C. § 241e–1 (1976)); 20 U.S.C. §§ 2740(b), 3806(b).

In Missouri, the Secretary initially took no steps to implement a bypass program. USDOE viewed the services required for nonpublic school students under Judge Collinson's injunction as comparable to those provided for public school students. On remand in 1975, however, Judge Collinson dissolved the injunction and accepted the Missouri SEA's plan to approve LEA applications, a plan providing for equitable expenditures but otherwise failing to ensure a program for nonpublic school children comparable in size, scope, or opportunity to the program offered to public school children. *Barrera v. Wheeler*, 531 F.2d 402, 406–07 (8th Cir.1976). For nonpublic school children, LEA applications provided for instruction given on the premises of private or *public* schools before or after regular school hours or on Saturday. Public school children continued to receive "pull-out" instruction on-premises during the school day. For a variety of reasons not unrelated to parent, pupil and school administration reaction to off-premise instruction (*see* p. 1361 infra), the number of private school children accepting the offered service dropped to one-half the number previously served under the Collinson injunction.

In 1976, representatives of parochial schools in Missouri asked the Secretary to consider a bypass of the state and local educational agencies. This request followed a decision by Missouri Commission of Education that administration of an on-premises program by the state with public funds provided by the USDOE violated the Missouri Constitution.[6] A USDOE investigating team then reviewed the statistics demonstrating the number of pupils participating, studied the LEA project applications and met with state and local staff as well as parents. It investigated accusations that the decline in participation in the off-premises program was caused by a parochial school boycott. After a thorough investigation, the team concluded that the poor attendance was due to student and teacher fatigue, conflicts with after school activities, late home arrival, parental concern for safety, students' conception that the after hours program was punishment, and conflicts with family obligations. Poor attendance was *not* due to a boycott. In addition, the team found that 31.2 percent of the Title I budget for nonpublic schools was spent on teachers' salaries and 40 percent was spent on non-instructional costs such as transportation and facilities rental. In stark contrast, 72.8 percent of funds in the public schools was applied to teachers' salaries.

On July 22, 1976, following this investigation, the Secretary concluded, pursuant to 20 U.S.C. § 3806(b)(2) of the bypass pro-

**5.** The costs of the bypass services, including any administrative costs, are deducted from the funds made available to the LEAs and SEAs in the affected area. 20 U.S.C. § 3806(b)(3)(A); 34 C.F.R. 20195(c).

**6.** The Director of Governmental Programs for the Archdiocese of St. Louis suggested a form letter for use by parochial school administrators in protesting the State Board of Education's refusal to provide remedial teachers within the parochial schools; the SEA received a "substantial amount of mail" from parochial school principals and parents of parochial school students, the "great majority of which related to the provision of Title I services in private schools during the school day," Tr. II at 17–18; and certain parochial school administrators of Catholic and Lutheran schools in Missouri wrote a letter to

USDOE seeking the invocation of the bypass because of their belief that the programs offered to nonpublic school students were not comparable to those being offered to public school students. The letter was jointly signed by various superintendents.

Dr. Wamble, on the letterhead of the Missouri Baptist Convention and in his capacity as president of the convention also wrote a letter. In contrast to the position of the parochial school administrators, he encouraged Senator Eagleton to vote "no" on the then-*proposed* amendment and, in defining his support, he noted the size of the convention (1,840 churches with reported membership of 555,000) and the convention's long-standing opposition to tax support of education in church-related schools.

vision, that the four LEAs investigated "substantially failed to provide for the participation on an equitable basis ... and the establishment of a 'bypass arrangement' to provide services ... [was] warranted." *Plaintiffs' Exhibit No. 304.* This decision followed a September, 1975 Jackson County, Missouri circuit court ruling which affirmed the prior position of the State Board of Education that Missouri's constitution prohibits state involvement in the use of Title I funds for instruction given on the premises of parochial schools, a decision repeated by the Missouri Supreme Court on December 30, 1976, in *Mallory v. Barrera,* 544 S.W.2d 556 (Mo.1976) (en banc).

After soliciting bids on three proposed bypass projects in Missouri, USDOE, on February 14, 1977, awarded contracts for three areas to BHHC. A fourth contract was awarded to BHHC on October 1, 1977 and, by the end of the 1979–80 school year, USDOE had consolidated its award for statewide nonpublic school Title I services under one contract with BHHC, bypassing fifty-three Missouri LEAs. This contract expired July 31, 1982. Under properly established contract procurement procedures, it was again awarded to BHHC for the 1982–83 school year.

Plaintiffs challenge the program in Missouri, alleging that BHHC is a religiously affiliated and controlled organization which, by receiving funds directly from the federal government for use in religiously affiliated schools, blatantly violates the prohibition against establishment of religion. This court agrees that at the time the initial consolidated award was made for the bypass program in Missouri, BHHC appeared to be a religiously affiliated organization even though its articles of incorporation, by-laws, and express purposes were entirely neutral. BHHC was incorporated on July 19, 1974, as a nonprofit Missouri corporation by four affiliates of St. Therese Catholic Church, including the pastor at that time, Norman Rotert. It originally operated out of the office space in buildings owned by St. Therese Church, and many of the teachers first hired were persons known to BHHC through their common affiliation with the parochial schools.

By the time BHHC was awarded a second state-wide contract, it had changed its apparent character and become ostensibly neutral. In 1979, the organization moved from the buildings owned by St. Therese Church to a commercially owned mall. Further, its new board members were not predominantly Catholic, and it deliberately avoided questioning prospective teachers about their religious affiliation. Consequently, the court finds that teachers were not purposely placed in a school which matched their chosen religion. This finding is corroborated by the evidence which shows only an incidental overlap in this representation. Indeed, seventy-nine percent of the BHHC teachers were assigned to schools with religious affiliations different from their own. Finally, while plaintiffs argue that the executive director of BHHC, John Cole, a former Catholic priest, was offered the job because he attended seminary with Father Rotert, an incorporator, the evidence reflects and this court finds that his religious affiliation is not the primary reason he was hired. Other factors in his hiring were his life-long friendship with Rotert, his experience as a former USDOE employee, and the fact that he possessed "capabilities considerably beyond anyone else that [Rotert] could possibly hire for the job." Tr. III at 27–28.

The bypass, including administrative costs, is funded by withholdings from Missouri's SEA allocations. USDOE requires BHHC to submit a Program Design on June 1 of each year which, when approved by USDOE, is the contractual basis for BHHC's obligation to provide Title I services the following year. No funds flow to the nonpublic school authorities.

In this case, the Program Design states that BHHC must provide services comparable to services provided by an LEA at the public school and it establishes procedures to compare costs, selection criteria, and the scope of the two programs. The educational services are provided *on site* at the paro-

chial schools during regular hours. The services include supplemental instruction in remedial reading, mathmatics, and language arts for educationally deprived children residing in low-income areas and enrolled in nonpublic schools, the majority of which are sectarian. The contract requires staff orientation and inservice training, supervision and monitoring of staff, coordination of services and consultation with the classroom teacher, selection of materials to fit the needs of students, assurance that materials are used only for Title I purposes, communication with parents, and remedial instruction based upon the individual needs.

BHHC takes steps to ensure its own religious neutrality and tries, sometimes without success, to ensure that the teachers and classrooms are neutral. BHHC supervisors inspect instructional facilities to make sure that the sites are adequate and free of religious artifacts. All teachers are monitored and trained solely by BHHC supervisors. Orientation sessions include oral instructions designed to ensure religious neutrality,[7] and the 1982–83, "Chapter I Handbook" affirms that "BHHC must manage the instructional program separate from the nonpublic schools to insure ... 'noninvolvement' and 'nonentanglement'...." *Defendants' Exhibit 53* at 21.

Nonpublic school personnel exercise no control over the program, the teachers, or the Title I curricula. The Title I teachers indicate that they, like public school teachers, refrain from religious discussion and instruct students who bring up related topics to discuss them with appropriate personnel. Title I materials are used only for Title I purposes. However, nonpublic school *students* are ultimately under the supervision of nonpublic school administrators, and federal monitoring often *excludes* inquiries about religious neutrality.

Administrative involvement of the federal government or BHHC with the private school personnel can be divided into three general categories: (1) contact for the purposes of planning or scheduling; (2) consultation regarding the educational progress of Title I students; and (3) contact necessary to monitor the administration of the Title I program. The contacts necessary to plan and schedule the Title I program on-premises include identification of the Title I facility within each school, identification of students eligible to receive Title I, scheduling of private school classes with the Title I classes, verification that Title I supplements and does not supplant the private schools, planning of curricula, and attendance by Title I personnel at faculty and parent-teacher meetings to explain the program. In addition, Title I personnel and regular nonpublic school teachers meet to discuss the children's educational needs and progress, and BHHC personnel contact the private school administrators to secure the removal of any visible religious symbols or, occasionally, to discuss discipline problems.

Beginning in 1980, USDOE required BHHC to obtain from nonpublic school officials an assurance of suitable facilities and, in 1981, *written* assurances that the settings were religiously neutral. However, USDOE did not define for BHHC the term "religiously neutral." BHHC, in turn, did not define the term for the school principals.

---

**7.** Oral instructions include 1) that the teachers are accountable only to BHHC supervisors and are not subject to the supervision or control of nonpublic school personnel; 2) that they are assigned to the nonpublic school solely to provide services to those students meeting the eligibility criteria and that they alone are responsible for the selection of those students; 3) that they are to consult with nonpublic school teachers and administrators about the educational needs of the students; 4) that they must assure that materials and equipment procured for Title I contain no religious content and are not used in the nonpublic school curriculum; 5) that they are not to engage in teaching or other cooperative instructional activities with nonpublic school teachers; 6) they are not to become involved with the religious activities of the nonpublic schools in any way except to attend faculty or parent-teacher meetings to explain Title I; 7) that they are not to introduce or allow any religious discussion with any nonpublic school personnel; and 8) that they are to maintain the Title I classroom free of religious symbols.

The classrooms, while generally reserved for the exclusive *use* of the Title I teachers, are otherwise controlled by the school. Some are rooms located within larger partitioned rooms and some are used by the school for purposes other than Title I activities when Title I classes are not being held. Many Title I rooms are identified by signs which identify them as Title I rooms, but the evidence does not indicate that these signs include notice that Title I is operated and controlled by USDOE and BHHC.

While many BHHC teachers have never seen a religious symbol inside a Title I classroom, religious symbols were found on some fifteen occasions mentioned in the evidence in the trial of this case. Most of the objects were promptly removed or covered, if nonremovable, upon their discovery. In one instance, however, removal occurred amid protests from the pastor and school board and after the superintendent of the Kansas City Archdiocese Schools consulted the bishop. Further, the evidence indicates that other incidents *may* have occurred—a Title I teacher would not necessarily report the presence of a religious symbol if handled without argument at the "school level." Finally, while the bypass teachers and supervisors are aware of religious symbols elsewhere in the buildings, none believe that their presence influences them or their instruction.

The Catholic elementary schools are subject to the jurisdiction, control, and authority of the Diocese, Archdiocese, and Parish in which they are located. The Lutheran elementary schools are subject to the control of their sponsoring congregations. These religiously affiliated schools have two goals—one is to "teach the youngsters about God and faith in God," and the other is to "develop all of the academic programs, the secular subjects, as professionally as possible." Tr. XVIII at 42.

Catholic principals generally prefer to hire Catholic teachers. However, several employ persons of other faiths so long as the teacher agrees to contribute to both the religious and educational objectives of the school. Tr. XVIII at 157. Lutheran school administrators, with few exceptions, hire members of the Lutheran Church-Missouri Synod. Lutheran teachers are "expected to present their lessons from a Christian viewpoint." *See, e.g., Eckhoff Deposition, March 15, 1982* at 106. Catholic school teachers are expected to avoid advocating positions contrary to the Church's teachings. One Archdiocesan handbook contains a specific prohibition against the use of Planned Parenthood materials and speakers.

Preference policies for admission, while they exist, have not resulted in the actual exclusion of non-affiliated students in either Catholic or Lutheran schools. Most of these schools have significant numbers of students who are non-Catholic or non-Lutheran.

There is no way of knowing whether the absence of Title I would result in a greater decline in enrollment than that already experienced by nonpublic schools, there being no specific evidence that parents select schools for their children where Title I is available. Because eligibility must be determined by the teacher, it appears that few parents would know at the time of application that their child is Title I eligible.

In most of the schools, thirty to forty-five minutes per day is spent on religious instruction. Religion class in the Catholic schools, while it may include instruction about other denominations, "is geared toward the Catholic religion," and emphasizes Christian living, moral values and Bible studies. Tr. XVIII at 61. Lutheran schools similarly strive "to bring the child in touch with the Word of God" … "so that the Holy Spirit may work a stronger faith" and so that he may become a "Christian leader." *Plaintiff's Exhibit No. 1260. See also Eckhoff Deposition, March 15, 1982* at 18, 42. With few exceptions, students are required to study, but *not* to accept or to obey the doctrines of the sponsoring church. Teachers in secular classes are encouraged to promote Catholic or Christian values through "values discussions."

The schools regularly schedule religious service or activities, like prayer, during the day, and conduct religious holiday activities. Attendance at religious activities is mandatory in some schools, but not in others. The students are visited regularly by members of the clergy and, in at least one Lutheran school, teachers ask students on Monday whether they attended church on Sunday. In summary, these religiously affiliated schools are an "integral part of the religious mission of the sponsoring church." [8]

### Legal Discussion

Plaintiffs make three challenges which may be disposed of at the outset of this discussion.

■ (1) First, plaintiffs argue that Title I is unconstitutional on its face. The Supreme Court has not held that Title I *requires* on-premise instruction. *Wheeler v. Barrera*, 417 U.S. 402, 418, 94 S.Ct. 2274, 2284, 41 L.Ed.2d 159 (1974). Government subsidized off-premise remedial instruction for nonpublic schools has been held constitutional in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). The court has reviewed the bypass amendment and finds that, on its face, it presents no further constitutional impediment to administration of the statute than was presented in *Wheeler*. In this court's opinion, Title I is facially valid because it may be administered within the confines of the

Constitution. *See City Council of Los Angeles v. Taxpayers for Vincent*, —— U.S. ——, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984).

■ (2) Plaintiffs also challenge the Secretary's decision to invoke the bypass in Missouri. This court finds that the Secretary, in making his decision, acted rationally and within the scope of his authority. His decision was supported by a history of imbalanced Title I services for Missouri's nonpublic school students, by substantial evidence gathered by the USDOE investigating team and by a consideration of the relevant facts. *See Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1319 (8th Cir.1981). Further, it was necessitated by Missouri law. *Mallory v. Barrera*, 544 S.W.2d 556 (Mo.1976) (en banc).

■ (3) Finally, plaintiffs attack the character of BHHC. While the religious affiliation of government employees, officers, or contractors in most circumstances is irrelevant and in no way offends the Constitution, *see, e.g., McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), this court notes in this case that the use of a religiously affiliated organization staffed exclusively at the inception of the program by people who were in one way or another affiliated with the Catholic Church, to implement a federally funded program in religiously affiliated schools, flew in the face of Congressional intent and violated

---

**8.** Two quotes illustrate and reinforce this court's finding that the Catholic and Lutheran schools at issue are "an integral part of the religious mission of the sponsoring church" as well as a conduit for secular education. In "Human Rights," a publication of the Commission on Human Rights of the Archdiocese of St. Louis in January, 1978, is an article, "Catholic Church and Its Schools," which states, in part:

Catholic schools provide the Church an effective way of helping families form young people in value of the gospel. Fr. Andrew Greeley of the University of Chicago has demonstrated that the Catholic school is the most effective instrument for forming young people. In its task of explaining the gospel and helping the young experience it, the Catholic school provides students whose members openly profess their faith, and the peer influence of young people who share a belief in

God. It offers time for prayer, the sacraments, and a daily religion class.... The Church in many ways, including through its schools, proclaims that the presence of God in all segments of a persons' life is the single most important value of all.

(Plaintiffs' Exhibit No. 1297). The Handbook of Trinity Lutheran School of St. Louis similarly explains:

It is the responsibility of parents to teach the truths of God's Word to their children because the Bible commands parents to "bring up their children in the nurture and admonition of the Lord." God has also commanded the Church to "teach all nations to observe all things commanded by God." The Lutheran School exists mainly for the purpose of assisting both parents and the Church in meeting these responsibilities.

(Plaintiffs' Exhibit No. 943, p. 1).

the Establishment Clause. Congress intended to substitute a religiously *neutral* organization for SEA–LEA agencies whose operations were prohibited by local or state law. Implementation, management, and supervision of the program by a puppet of the Church, however well-intentioned, is tantamount to direct fiscal government aid to religiously affiliated schools. *See, e.g., Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 9 L.Ed.2d 745 (1971). However, plaintiffs' challenge to the original contract award was rendered moot by the expiration of the initial contract,[9] and, because BHHC was aware of its error long before the award of the second contract, it dramatically changed the composition of its staff and Board of Directors, transforming BHHC into what was ostensibly an entirely neutral organization.

### Administration of the On-Premise Program

The First Amendment to the Constitution of the United States provides in its first clause: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof ...." This provision, the Establishment Clause, historically has served two purposes. It worked to prevent the federal government from establishing one church, and it prohibited aid or preferential treatment to a particular denomination. *See* Esbeck, *Establishment Clause Limits on Governmental Interference with Religious Organizations,* 41 Wash. and Lee L.Rev. 347, 362–63 (1984). The Establishment Clause accounted for the concerns of a dominant federalism, reserving for the states the authority to deal with religious matters.[10] It "rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Abington*

*School District v. Schempp,* 374 U.S. 203, 221, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844, citing *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962). A church unduly involved with government might be subverted to redirect its programs to meet ends chosen by government. The church would be compromised in its efforts to act in accordance with its higher calling. *Id.*

In extending Title I in a nondiscriminatory manner to religiously affiliated schools, courts recognize the parallel goals of Congress, individual states, and particular institutions to educate all students within the confines of the existing economic structure. The "State itself, concededly anxious to avoid assuming the burden of educating children now in private and parochial schools, has a strong motivation for increasing this aid as public school costs rise and population increases." *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 797, 93 S.Ct. 2955, 2978, 37 L.Ed.2d 948 (1973). The parents of parochial school children, electing by reason of their convictions to send their children to these schools, nevertheless pay taxes for public education and, therefore, have historically sought some measure of public support to enhance the quality of education for their children or at least to make it comparable to that received by public school children. This is the case here where public funds have been appropriated to provide remedial instruction for the educationally deprived.

At least to the extent that such remedial instruction might be provided by public school teachers to parochial school children off the premises of the parochial schools, the Supreme Court has succumbed to these intertwined economic and educational

---

**9.** Thus, this court need not reach the issue of whether plaintiffs have standing to challenge the award to BHHC. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 100 (1982).

**10.** The First Amendment, like the entire Bill of Rights, initially served to limit only the federal

government. In 1940, the Supreme Court incorporated the First Amendment into the Fourteenth Amendment and extended its application to the various states. *Everson v. Board of Education,* 330 U.S. 1, 13, 67 S.Ct. 504, 510, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

goals, stating, "Certainly the Establishment Clause should not be seen as foreclosing a practical response to the logistical difficulties of extending needed and desired aid to all the children of the community." *Wolman v. Walter*, 433 U.S. at 247, n. 14, 97 S.Ct. at 2605 n. 14. Accordingly, the Supreme Court, through its interpretations of what is constitutionally permissible, has sanctioned various forms of government aid to parochial schools, aid which requires increasing allotments of tax money to parochial schools and which fosters increasing church school dependence on the federal government. *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. at 797–98, 93 S.Ct. at 2977–78.

To maintain flexibility while preserving the cherished safeguard of the Establishment Clause, the Court has steered away from a "legalistic minuet in which precise rules and forms must govern." *Lemon v. Kurtzman* (and its companion *Earley v. DiCenso*), 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). The line of separation between church and state is, according to the Court, necessarily maintained as a "blurred, indistinct and variable barrier depending on all the circumstances of a particular relationship." *Id.* Aid to private church-affiliated colleges is upheld because these higher institutions are "less likely" to inculcate religious values than their "pervasively sectarian" elementary and secondary school counterparts. "This reduces the risk that government aid will in fact serve to support religious activities." *Tilton v. Richardson*, 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1971). Aid to elementary schools in the form of *off-premise* remedial instruction has been upheld because the entanglement is not "excessive," *Wolman v. Walter*, 433 U.S.

229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), and aid in the form of textbooks is permissible because its "primary" effect is not to foster religion but to promote the secular education of all children, regardless of their religion. *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). "That religion may indirectly benefit from governmental aid to the sectarian activities of churches does not convert that aid into an impermissible establishment of religion." *Lemon v. Kurtzman*, 403 U.S. at 664, 91 S.Ct. at 2136 (White, J., concurring).

At apparent odds with the blurred barriers or standards set by the Court is the Constitution's admonition that Congress shall make no law "respecting" the establishment of religion—that is, a law which could "lead" to the establishment of a state church or state religion or a law which the Supreme Court considers to be "step" in that direction. *Lemon v. Kurtzman*, 403 U.S. at 612, 624, 91 S.Ct. at 2111, 2116.

The "danger" or "risk" that certain forms of governmental aid can be diverted to religious use in some cases is sufficient to preclude that aid. *See, e.g.*, *Wolman v. Walter*, 433 U.S. at 250, 97 S.Ct. at 2606. With respect to other forms of governmental aid, such as remedial instruction, the "danger" creates a need for the government perpetually to monitor the aid to ensure its ultimate neutrality and to guarantee that the aid is not used to foster religion.[11] This necessity for surveillance in turn creates the "potential" or "possibility" of excessive entanglement. *Meek v. Pittenger*, 421 U.S. 349, 372, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 217 (1975). Even aid which creates a mere "diminished probability" of impermissible use does not pass

---

**11.** In *Felton,* the court noted that taxpayers interested in the preservation of the Establishment Clause "cannot reasonably be expected to mount perpetual guard." Further, the court stated, "In our view, the Court has been wise in relying upon its reasoned apprehension of potentials rather than sanctioning case-by-case determinations of the precise level of risk of fostering religion, since such an empirical approach would inevitably lead to increased litiga-

tion in an area where some degree of certainty is needed to prevent constant controversy.... [T]here could be no greater step away from the goal of *reasonable certainty* than to adopt a rule that the validity of a program should hinge on its precise workings from year to year." *Felton v. Secretary, United States Dep't. of Educ.,* 739 F.2d 48 (1984), *hearing pending,* —— U.S. ——, 105 S.Ct. 241, 83 L.Ed.2d 180 (1984).

constitutional muster. *Id.* at 370–71, 95 S.Ct. at 1765–66. Thus plaintiffs in actions such as this need demonstrate only an *unacceptable risk* of constitutional harm, not actual prejudice. With respect to subsidized teachers, "the State must be *certain*, given the Religion Clauses, that [they] do not inculcate religion." *Meek v. Pittenger*, 421 U.S. at 371, 95 S.Ct. at 1766, quoting *Earley v. DiCenso*, 403 U.S. at 619, 91 S.Ct. at 2114 (emphasis added).

In summary, the Supreme Court since 1971 has justified various forms of aid to religiously affiliated schools first, by avoiding a ritualistic or literal quest for the advice of the Founding Fathers with its blurred barriers, and second, by determining that the challenged practices do not even tend to promote the type of interdependence between religion and state which the First Amendment was designed to prevent.

■ The Court has advanced three tests for use in analyzing Establishment Clause challenges to statutes providing aid for parochial school children; all must be passed for the statute to survive the challenge. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster 'an excessive government entanglement with religion.' " *Lemon v. Kurtzman* (and its companion *Earley v. DiCenso* ), 403 U.S. at 612–13, 91 S.Ct. at 2111.

### A. *Secular Legislative Purpose*

The express purpose of Title I is to provide remedial education for all educationally deprived children meeting certain criteria of need, regardless of whether they attend a religiously affiliated school or a public one. Plaintiffs do not suggest that the enactment of Title I was motivated by an improper purpose. It serves a purely secular and nondiscriminatory legislative end unassociated with the Church's separate goal to advance religion. The statute on its face and as administered satisfies the first test.

### B. *Primary Effect*

■ Regardless of the permissible nature of its purpose, in order for this court to hold that a statute providing aid to religiously affiliated schools, as administered, neither advances nor inhibits religion, the aid must be identifiable and separable from assistance to sectarian activities. *See Wolman v. Walter*, 433 U.S. at 250, 97 S.Ct. at 2606; *Committee for Public Education of Religious Liberty v. Nyquist*, 413 U.S. at 782, 93 S.Ct. at 2970. Additionally, the aid must primarily benefit the child or student rather than the sectarian institution. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed.2d 71 (1947). While it is undisputed that aid in the form of textbooks, transportation, and certain diagnostic services ultimately results in financial support for the collective enterprise of sectarian institutions, the Court has determined that this support is a mere by-product of aid which primarily benefits the child. *Id.* In contrast, aid has a primary effect of advancing religion when it flows directly to pervasively sectarian institutions or when it funds a specifically religious activity in an otherwise secular setting. *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). *See also Wolman v. Walter*, 433 U.S. at 251, 97 S.Ct. at 2607 (invalidating loan for instructional material and equipment because it "inescapably" had the improper primary effect of advancing the sectarian enterprise).

The present case involves remedial aid provided by teachers paid and supervised by a tax-supported nonreligious entity, BHHC, authorized by a statute which on its face provides that it shall not "be construed to authorize the making of any payment under this chapter for religious worship or instruction." 20 U.S.C. § 3384. In fact, there is no evidence that any BHHC teacher has advanced religious ideologies in accomplishing Title I instruction. The Supreme Court, in *Wolman*, upheld such aid *off-premises*, finding that the aid did not have a primary effect which advanced reli-

gion. 433 U.S. at 248, 97 S.Ct. at 2605. Implicit in this finding is the conclusion that the aid was identifiable and separable from assistance to sectarian activities, and that it primarily benefited the student.

In the present case, the instruction takes place *on-premises* in a room only sometimes identified as the "Title I room." Title I instruction supplements rather than supplants other instruction, thus maximizing the benefit to students who would otherwise receive no such instruction and minimizing the benefit to the school as a whole. Thus, defendants contend that the location of instruction does not alter the primary effect of Missouri's Title I program.

This court is prepared to accept the conclusion that in the administration of this program the nonpublic schools are not relieved of any financial responsibility. However, this court recognizes that defendants' conclusion—that the location does not alter the primary effect—is difficult to prove to a "certainty" because, while the evidence in this case was extensive, the surveillance over the teachers was not. Sectarian ideologies, encouraged in a pervasively sectarian institution, may be introduced through subtle references. While the location does not diminish the benefit to children, it renders it more difficult to "identify and separate" the functions of Title I instruction or to ascertain whether the aid has a direct rather than incidental or an immediate rather than remote effect of advancing religion.

■ Substantial aid to the education of parochial school children necessarily results in some aid to the sectarian enterprise as a whole, *Wolman v. Walter*, 433 U.S. at 250, 97 S.Ct. at 2606, and a law found to have a legitimate "primary" effect to benefit children is not immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. at 783, n. 39, 93 S.Ct. at 2971, n. 39. This court concurs with *Nyquist*. "We do not think that such metaphysical judgments are either possible or

necessary" under the circumstances of this case. 413 U.S. at 783, n. 39, 93 S.Ct. at 2971, n. 39. *See also Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d at 69–70.

### C. Excessive Entanglement

To prevent, as far as possible, "the intrusion of either [the state or religious institutions] into the precincts of the other," *Lemon v. Kurtzman*, 403 U.S. at 614, 91 S.Ct. at 2112, the Court devised a third standard which demands that the program avoid "an excessive government entanglement with religion." *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The test of "excessive entanglement" is "inescapably one of degree." *Id.*

■ To determine whether the statute or its administration fosters "excessive entanglement" between the church and the government, the court must examine the character and purposes of the institutions that are benefited. *Lemon v. Kurtzman*, 403 U.S. at 615, 91 S.Ct. at 2112. If an institution is "pervasively sectarian," *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), or indistinguishable from one that is, *Wolman v. Walters*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the court must examine the nature of the aid that the State provides, the resulting relationship between the government and the religious authorities, and the potential for "political divisiveness" created by the program. *See Lemon v. Kurtzman*, 403 U.S. at 615, 91 S.Ct. at 2112.

To determine whether a school is pervasively sectarian and, therefore, subject to strict Establishment Clause limitations, the Supreme Court has adopted the following guidelines: (1) Is it *controlled* by a church or religious organization? (2) Is its *purpose* to teach, propogate, and promote a particular religious faith and to inculcate religious values? (3) Does it *conduct* its programs to fulfill that purpose? (4) Are there religious *restrictions* on admissions of students or on faculty appointments?

(5) Does it *require instruction* in religious doctrine and impose religious restrictions on what the faculty may teach? (6) Does it *require attendance* at or participation in religious worship? (7) Is the school an *integral part* of the mission of the church? *Meek v. Pittenger*, 421 U.S. at 356, 95 S.Ct. at 1758.

This court encounters no difficulty in finding on the basis of the record made here that the religiously affiliated elementary schools in Missouri at which BHHC conducts classes funded by federal tax dollars are pervasively sectarian or indistinguishable from those that are for purposes of constitutional analysis. While all of the schools in question here do not possess all the characteristics found in *Meek*, they are essentially schools in which education is an integral part of the dominant sectarian mission of the church and in which an atmosphere dedicated to the advancement of religious beliefs is constantly maintained. *Meek v. Pittenger*, 421 U.S. at 371, 95 S.Ct. at 1766. In determining whether the Establishment Clause is at issue, this court has not engaged in a school by school, year by year analysis. To ensure that *each* school each year was not "pervasively sectarian" would require extensive revision of the existing structures and extensive government restrictions. Such surveillance would entail even greater entanglement than that found here and would obviously offend the Establishment Clause. In like manner, an analysis of the character of each school is not required by the Establishment Clause. *See Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d at 68.

Unlike *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), in which the aid was a "one-shot" allocation of funds for college buildings, the Title I program requires continuing allocations based on the number of children served and subject to inflation and escalating needs.

The need for annual appropriations and the knowledge "from long experience with both Federal and State Governments that aid programs of any kind tend to become entrenched, to escalate in cost, and to generate their own aggressive constituencies," *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. at 797–98, 93 S.Ct. at 2977–78, led the Court, first in *Lemon*, to consider the "potential for political divisiveness" in its discussion of "excessive entanglement." 403 U.S. at 622–25, 91 S.Ct. at 2115–117. In *Nyquist*, the Court noted, "[W]hile the prospect of such divisiveness may not alone warrant the invalidation of state laws ... it is certainly a 'warning signal' not to be ignored." 413 U.S. at 797–98, 93 S.Ct. at 2978. In *Meek*, the Court again discussed political divisiveness, holding that political fragmentation along religious lines, *together* with administrative entanglement necessary to insure services in church-related schools are strictly neutral and nonideological "compels the conclusion that [the state statute] violates the constitutional prohibition against laws 'respecting an establishment of religion.'" 421 U.S. at 372, 95 S.Ct. at 1767. Political divisiveness is evidenced in Missouri, not only through efforts to increase or decrease annual appropriations, but through a history of continuing litigation, through the persistent indignation of plaintiffs, including Hugh Wamble of the Southern Baptist Convention, and through the disputes which occur between church factions, some of which would not agree to the removal of church symbols in Title I rooms or the total relinquishment of control to a federally funded corporation.

In pervasively sectarian elementary and secondary schools, the risk of indoctrination or the process of inculcating religious doctrine is enhanced because the children are at an impressionable age.[12] *See, e.g.,*

---

12. Distinguishable are those cases where the Court has upheld aid to religiously affiliated colleges because college students are less impressionable, because religious indoctrination is not a substantial purpose or activity, because

there is less likelihood that religion will permeate the secular advocation, and, therefore, because the schools are not pervasively sectarian for purposes of constitutional analysis. *Til-*

*Lemon v. Kurtzman,* 403 U.S. at 616, 91 S.Ct. at 2113. The correspondingly high risk of indoctrination requires this court to scrutinize closely the nature of the aid and the relationship between the government and the religious authorities.

In this case, the nature of the aid is on-premise remedial instruction by government subsidized teachers. Government subsidization of Title I instruction in Missouri is unlike any other form of government controlled aid because it directly involves teachers placed on the premises of the pervasively sectarian environment. First, teachers are peculiarly susceptible to influence by their environment. *Wolman v. Walter,* 433 U.S. at 247, 97 S.Ct. at 2605. Second, unlike the diagnosticians discussed in *Wolman,* teachers are afforded a unique opportunity to form substantial and enduring relationships with students and to transmit ideological views. *Id.* Third, a teacher's handling of a subject is unpredictable. Because instruction, unlike the content of a textbook, inherently varies from teacher to teacher in content and emphasis, there is a great potential for involving in that content some aspect of faith or morals. *Lemon v. Kurtzman,* 403 U.S. at 617, 91 S.Ct. at 2113.

Because this is so, the task of this court is to ascertain whether, without excessive entanglement, the "state [can] be certain, given the Religion Clause, that subsidized teachers do not inculcate religion" when placed on the premises of pervasively sectarian institutions, albeit in rooms largely devoid of religious symbols. *Meek v. Pittenger,* 421 U.S. at 370–71, 95 S.Ct. at 1765–66. Because it is required that the state be "certain," it cannot place reliance "on the subjective good faith and professionalism of sectarian teachers." *Id.* at 369, 95 S.Ct. at 1765. The fact that BHHC's Title I instructors in this case assert that environmental pressures do not influence their work and that religious views are not conveyed to the students is insufficient to diminish significantly the

ton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1972).

risk or danger of unconstitutional indoctrination. Thus, the state becomes obligated to perform a nearly impossible task, the task of reviewing both the content and the total environment of instruction to determine that whatever is transmitted adheres to the restrictions imposed by the statute and by the Constitution.

*Meek* and *Wolman* indicate that the supervision, while it is by government-paid authorities over government-paid and supervised teachers, is not significantly distinct from the continuing surveillance required over religiously controlled teachers, *unless* the facilities themselves are religiously neutral. *Wolman v. Walter,* 433 U.S. at 247, 97 S.Ct. at 2605; *Meek v. Pittenger,* 421 U.S. at 371–72, 95 S.Ct. at 1766–67. Influence on a therapist's behavior can be exerted either by the fact that he serves a sectarian administrator or the fact that he operates under the pervasive atmosphere of a religious institution. The danger arises from the nature of the institution, not the nature of the pupils. *Wolman v. Walter,* 433 U.S. at 247–48, 97 S.Ct. at 2605–06.

If these services are offered at truly *religiously neutral locations,* the danger perceived in *Meek* does not arise, and the corresponding entangling supervision by publicly paid state inspectors on parochial school property would be largely unnecessary. *Wolman v. Walter,* 433 U.S. at 247–48, 97 S.Ct. at 2605–06. "Supervision of public employees performing public functions *on public property* does not create any entanglement between church and state." *Id.* at 248, 97 S.Ct. at 2605 (emphasis added). Instruction conducted *on the premises* of pervasively sectarian institutions, on the other hand, while providing a practical response to the growing economic needs of parochial schools and the state, creates in Missouri an unacceptable *risk* that teachers here will foster religion and the corresponding necessity for excessively entangling surveillance.[13]

13. Some might argue that this is an "absolutist" approach, a "categorical imperative" or a "per

The nature of the aid—continuing remedial instruction on-premises—necessarily contaminates the relationship between the religious authorities and the government's independent contractor.[14] On-premise teachers, although technically and legally supervised by state authorities are presumptively influenced by the environment in which they work, and this enhanced opportunity for influence requires greater supervision. *See Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). "The prophylactic contacts required to ensure that teachers play a strictly nonideological role ... necessarily give rise to a constitutionally intolerable degree of entanglement between church and state." *Meek v. Pittenger*, 421 U.S. at 370, 95 S.Ct. at 1765, citing *Lemon v. Kurtzman*, 403 U.S. at 619, 91 S.Ct. at 2114.

The *danger* perceived in *Meek* does not subside with the abandonment of religious artifacts. Religious neutrality cannot exist on the premises of a pervasively sectarian institution. The need for state monitoring in parochial schools is a continuing one. Even monitoring, however, cannot extinguish subliminal pressure exerted by the mere presence of a priest in the hall or at the door, by religious books in every student's hands, and by a teacher's own felt presence of the Church in the room.

The room belongs to the church and is in its ultimate control. Like the public school teachers described in *Felton*, BHHC's Title I instructors are

> so far as appearance is concerned, a regular adjunct of the religious school. They pace the same halls, use classrooms

in the same buildings, teach the same students, and confer with the teachers hired by the religious schools, many of the members of religious orders. The religious school appears to the public as a joint enterprise staffed with some teachers paid by its religious sponsor and others by the public.

*Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d at 67–68. It cannot be said that on-premise Title I rooms, like the off-premise sites in *Wolman*, are "neither physically nor educationally identified" with the nonpublic school. *See Wolman v. Walter*, 433 U.S. at 247, 97 S.Ct. at 2605.

To prevent teachers from indoctrinating children with values of the church, the government is not only required to maintain rooms free of religious symbols, it is required to monitor the instruction and to guard against visible religious authorities who by their presence at or near a Title I room may inadvertently pressure teachers to conform. *See Public Funds for Public Schools v. Marburger*, 358 F.Supp. 29 (D.N.J.1973), *aff'd mem.*, 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974). The need for this constant on-premise monitoring or surveillance, described by some courts as "state inspectors prowling the halls of parochial schools and auditing classroom instruction," *Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d at 67, citing *Lemon v. Kurtzman*, 403 U.S. at 650, 91 S.Ct. at 2129 (opinion of Brennan, J.), added to the routine administrative contacts otherwise required to establish the program, to coordinate schedules, and to advise parochial school teach-

se" rule. In response, this court notes first, that it is a holding based on its finding that the Title I rooms are not truly religiously neutral, a finding supported by numerous incidents wherein religious symbols were found in these rooms and by facts which indicate that the on-premise Title I rooms are in most instances physically and educationally identified with the parochial institution. *See* p.p. 15–16. Second, the court notes that such a holding reflects no more of an "absolutist" approach than the Supreme Court's own guidelines on textbooks, buses, diagnosticians, and equipment which, while they appear to be "per se" rules, obviously followed a similar analysis.

**14.** The Court in *Wheeler v. Barrera*, 417 U.S. at 426, 94 S.Ct. at 2287 indicated that the Fourth Amendment implications may vary according to the precise contours of the plan that is formulated. It noted that a program whereby a former parochial school teacher is paid presents "quite different problems" from a program whereby a public school teacher, under public control, is sent into the parochial school. We agree that *different problems* are presented and note the wisdom of the Court's admonition that "we intimate no view as to the Establishment Clause effect of any particular program." *Id.*

ers of a student's progress, creates entanglement which far surpasses that necessitated by off-premise instruction.[15]

Religion demands a spiritual identification. The obvious covering of religious symbols and removal of religious artifacts do not diminish qualitatively the spirituality of an environment otherwise pervasively sectarian. And if the otherwise religious environment, through governmental control, is substantially altered to obtain government-funded aid, the very evil against which the Founding Fathers sought to protect has been fostered—the church has been compromised.

Analytically, a government that can provide on-premise remedial instruction in parochial schools may provide on-premise instruction in all secular subjects in those schools. *Accord Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d at 66–67. Because we recognize that the religiously affiliated school, as a *whole*, has as a central purpose, the fostering of religion, and that the pieces comprise the whole, we recognize that state control over any substantial portion of those pieces undermines the purpose of religious instruction and denigrates the institution's ability to convey freely religious ideals within its own walls and to integrate these values with education. Title I, on its face, does not require or suggest that its program be conducted on the premises of religiously affiliated schools. *See Wheeler v. Barrera*, 417 U.S. at 419, 94 S.Ct. at 2284. On its face, Title I does not violate the Establishment Clause.

The momentum developed in this area of the law may continue only if sanctioned by further Supreme Court opinions. The risk early envisioned by the Court is increased by the "difficulty of perceiving in advance exactly where the 'verge' of the precipice lies." *Lemon v. Kurtzman*, 403 U.S. at 624, 91 S.Ct. at 2117. We concur with the Second Circuit in *Felton. Wolman* suggests constitutionally permissible alternatives—all off-premises at religiously neutral sites. Current law does not permit the extension of tax-supported remedial instruction into parochial schools. The precipice lies here.

### Epilogue

There is a danger that this decision may be misconstrued by large segments of our society, both those who will agree with it and those who will condemn it. Some may say, because of the strength of their varying convictions, that this result is "anti-religious" in general or "anti-Catholic" in particular. The court mentions this only because there has been intertwined in the filings, court presentations, and in the prior ardent lobbying efforts of the *pro se* plaintiff in particular, some suggestion that his is a crusade against a diabolical heirarchy which is set upon destroying free religion in America. The court expressly disavows any such view.

In reaching the result here announced, this court wants it made absolutely clear that it tolerates no part of the thinking of the "Know Nothings" of the mid-19th Century, or the polemics of Paul Blanshard in the 1930's and 40's or the 1960 opposition to John F. Kennedy because of his Catholicism. If the plaintiffs draw comfort for any such point of view out of this decision, it is only by the sheerest and most accidental coincidence of their views and the dictates of First Amendment law as it has been previously announced by the Supreme Court.

This court is not insensitive to the emotionally unpopular termination of a program of aid to educationally deprived children which may *but need not necessarily* follow this decision. Educational assistance to children who through no fault of their own have been deprived in their early lives and whose futures may be bleak with-

---

**15.** *Meek* rested on the conclusion not that instruction of pervasively sectarian premises actually "fostered" religion, but rather that it required *monitoring* violative of the entanglement test. *Wolman* affirmed *Meek's* prohibition of services, stating that the "danger arose [in *Meek* ] from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school." *Wolman v. Walters*, 433 U.S. at 247, 97 S.Ct. at 2605.

**1374**

out the kind of remedial education envisioned by this statute is entirely consistent with the long-held American goal of equal access to education for all. Be that as it may, this result is one that is dictated by the necessity of preserving one of the cherished freedoms guaranteed by our Constitution. We concur with Judge Friendly. Such freedoms were hard won and they are protected only by hard decisions.

Accordingly, it is

ORDERED that defendants' Motion to Stay Disposition of this case is denied. It is further

ORDERED that the Title I bypass as currently administered in Missouri on the premises of religiously affiliated schools violates the First Amendment of the United States Constitution and its further administration in that manner is, therefore, permanently enjoined. It is further

ORDERED that this injunction be stayed pending disposition by the Supreme Court of *Felton v. Secretary, United States Dep't. of Educ.*, 739 F.2d 48, *hearing pending*, —— U.S. ——, 105 S.Ct. 241, 83 L.Ed.2d 180 (1984).